## INTERNATIONAL RAILWAY COMPANY *v.* DAVIDSON, INDIVIDUALLY AND AS COLLECTOR OF THE PORT OF BUFFALO, ET AL.

APPEAL FROM AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 340. Argued January 3, 4, 1922.—Decided January 30, 1922.

1. The Act of February 13, 1911, c. 46, 36 Stat. 899, authorizing special permits for immediate lading and unlading of vessels and other conveyances, and empowering the Secretary of the Treasury to fix extra compensation to be paid customs officials at the expense of the licensees for Sunday and holiday service in such lading or unlading, was not applicable to an international toll bridge nor to the operation thereon of a line of passenger trolley cars; nor was it made so by the amendment of February 7, 1920, c. 61, 41

Stat. 402, by which the extra compensation was extended to cover overtime " in connection with the unlading, receiving, or examination of passengers' baggage," this provision being given full effect if confined to baggage of passengers on vessels for the immediate lading or unlading of whose cargoes special license may issue under the original act. P. 512.

2. A company owning and operating a toll bridge, with a line of trolley cars, across the Niagara River, over which was heavy passenger travel in the cars, in other vehicles and on foot, and as to which customs inspection service had been maintained by the United States, as well on Sundays and holidays, when the travel was heaviest, as on week days, was notified that unless it procured a special license under the above amended act, which would necessitate its agreeing to pay the amount of extra compensation for customs officials and giving a bond to indemnify the United States against all losses arising from the granting of the license, no vehicle, except the cars, would be permitted to enter the United States on Sundays and holidays, and no passengers, except after surrender of all personal baggage, including handbags, to a customs guard, and that all vehicles except the cars, and all baggage surrendered, would be held by the collector at the owner's risk for examination on the following working day. *Held:* (*a*) That the instruction of the Secretary of the Treasury to this effect could not be sustained as a discretionary determination that the movement of merchandise at the place did not justify maintaining customs service on the days in question. P. 514. (*b*) That it was not a valid regulation under Rev. Stats., § 161, but was both unreasonable and inconsistent with law, virtually laying a tax and providing for extra compensation of officials from a private source contrary to statute. P. 514. (*c*) That the bridge owner, as well as passengers and vehicle owners, had a standing to question the regulation. P. 515.

273 Fed. 153, reversed.

REVIEW of a decree of the Circuit Court of Appeals affirming the action of the District Court in dismissing, for want of equity, a bill filed by the present petitioner to restrain the respondent collector of customs from putting into effect measures affecting the customs inspection at the terminus of petitioner's toll bridge.

*Mr. Basil Robillard* for appellant and petitioner.

*Mr. Assistant Attorney General Ottinger,* with whom *Mr. Solicitor General Beck* and *Mr. Harvey B. Cox* were on the brief, for appellees and respondents.

*Mr. John W. Beaumont,* by leave of court, filed a brief as *amicus curiae.*

MR. JUSTICE BRANDEIS delivered the opinion of the court.

The International Railway Company owns and operates two public toll-bridges across the Niagara River between the United States and Canada. One is at Niagara Falls, the other at Lewiston, a short distance below. Over each bridge the company operates regularly its passenger cars; and over each there is heavy passenger travel also in other vehicles and on foot. For more than twenty years prior to June, 1920, the Government had, at its own expense, maintained at the American end of these bridges customs inspectors, continuously day and night, including Sundays and holidays. Then the Collector of Customs of the Port of Buffalo notified the company that on Sundays and holidays thereafter no vehicle (except trolley cars) would be permitted to enter the United States; that no passenger would be allowed to enter except after surrender to the customs guard of all personal baggage, even the smallest handbag; and that all vehicles (except trolley cars) and all baggage surrendered would be held by the Collector, at the owner's risk, for examination on the next following working day. The company was further advised that continued service of customs inspectors on Sundays and holidays could be secured, if it would make application for a special license under the Act of February 13, 1911, c. 46, 36 Stat. 899, as amended by the Act of February 7, 1920, c. 61, 41 Stat. 402. Day and night customs service on ordinary week days was to be continued at the expense of the Government as thereto-

fore.   The Collector acted throughout under instructions of the Secretary of the Treasury.

The Act of 1911, entitled "An Act To provide for the lading or unlading of vessels at night", etc., declares that immediate lading or unlading of any vessel or other conveyance can be had upon the obtaining by "master, owner, agent, or consignee" of a special license therefor. To obtain the license it is necessary that the applicant shall agree to pay to the Collector of Customs an amount equal to the extra compensation of the customs officers. employed therefor at night or on Sundays or holidays, and shall give a bond conditioned to indemnify the United States against all losses which arise from granting the license.   The compensation payable for overtime, including services on Sundays and holidays, was fixed by the Secretary of the Treasury at double the day rate; and the amount of the bond for a six months' license is fixed by the statute at fifty thousand dollars.   The amendment of 1920 provides, among other things, that the work for which extra compensation is payable by the licensee shall include that of examining "passengers' baggage."   The company does not unlade any cargo at night or on Sundays or holidays, and does not contemplate doing so.   It is interested only in preserving the passenger traffic passing over its bridges.   This traffic on working days is not nearly as heavy as on Sundays and holidays.   Discontinuance of the customs service on those days would, in large measure, destroy that traffic.

The company brought this suit in the Federal District Court for Western New York against the Collector to enjoin the threatened action, insisting that the provisions of these statutes are not applicable to a toll-bridge and that the Collector is without power to exact, as a condition of continuing the service, that the company take a license with the attendant burdens.   The District Court

dismissed the bill for want of equity, 271 Fed. 313; and its decree was affirmed by the Circuit Court of Appeals, 273 Fed. 153. The case was brought here by appeal; and a petition for a writ of certiorari was also filed, consideration of which was postponed until the hearing on the merits. Whether the action taken and threatened exceeds the powers conferred by law is the main question presented.

The Act of 1911 contained no reference whatsoever to passengers or to their baggage or personal effects. It dealt exclusively with the grant of special permits for the immediate lading or unlading of vessels and other conveyances. It consists of five sections and a repealing clause. The first four prescribe the conditions under which such license shall issue and the proceedings to be taken thereunder. The fifth section gives the Secretary of the Treasury power to fix extra compensation to be paid customs officials serving at night, on Sundays or on holidays in connection with lading or unlading under such special permit; and it provides that an amount equal to the extra compensation shall be paid to the Collector by the licensee. The amendatory Act of February 7, 1920, made no change whatsoever in the first four sections of the Act of 1911. It dealt solely with the extra compensation, merely substituting the new § 5, shown in the margin.[1] This

---

[1] In the following reprint of the new § 5 the phrases omitted from old § 5 are bracketed and are in small capitals. The new phrases are in italics. That part of the section which remained unchanged is in ordinary type.

" The Secretary of the Treasury shall fix a reasonable rate of extra compensation for [NIGHT] *overtime* services of inspectors, storekeepers, weighers, and other customs officers and employees *who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian, or on Sundays or holidays, to perform services* in connection with the lading or unlading of cargo [AT NIGHT], or the lading [AT NIGHT] of cargo or merchandise

substituted section defines what shall be deemed overtime, how the rate of extra pay shall be fixed, and what the work is, for which extra compensation shall be paid. In

for transportation in bond or for exportation in bond or for [THE] exportation with benefit of drawback, *or in connection with the receiving or delivery of cargo on or from the wharf, or in connection with the unlading, receiving, or examination of passengers' baggage* [BUT SUCH RATE OF COMPENSATION SHALL NOT EXCEED AN AMOUNT EQUAL TO DOUBLE THE RATE OF COMPENSATION ALLOWED TO EACH SUCH OFFICER OR EMPLOYEE FOR LIKE SERVICES RENDERED BY DAY], *such rates to be fixed on the basis of one-half day's additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o'clock postmeridian (but not to exceed two and one-half days' pay for the full period from five o'clock postmeridian to eight o'clock antemeridian), and two additional days' pay for Sunday or holiday duty.* [,] The said extra compensation *shall* [TO] be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted to the collector of customs, who shall pay the same to the several customs officers and employees entitled thereto according to the rates fixed therefor by the Secretary of the Treasury: *Provided, That such extra compensation shall be paid if such officers or employees have been ordered to report for duty and have so reported, whether the actual lading, unlading, receiving, delivery, or examination takes place or not.* Customs officers acting as boarding officers and any customs officer who may be designated for that purpose by the collector of customs are hereby authorized to administer the oath or affirmation herein provided for, and such boarding officers shall be allowed extra compensation for services in boarding vessels at night or on Sundays or holidays at the rates prescribed by the Secretary of the Treasury as herein provided, the said extra compensation to be paid by the master, owner, agent, or consignee as such vessel[s]: *Provided further, That in those ports where customary working hours are other than those hereinabove mentioned, the Collector of Customs is vested with authority to regulate the hours of customs employees so as to agree with prevailing working hours in said ports, but nothing contained in this proviso shall be construed in any manner to affect or alter the length of a working day for customs employees or the overtime pay herein fixed."*

this work it includes that " in connection with the unlading, receiving, or examination of passengers' baggage." The contention of the Government is that the mere insertion of these words in § 5 has the effect of establishing a system of special licenses applicable to toll-bridges which are not vessels or other conveyances, and on which there is neither cargo, lading or unlading, but passengers who pass on foot or in trolleys or automobiles.

The contention is at variance with the language of the act and with its history. Obviously the words " vessel or other conveyance " are not appropriate to describe the plant of a toll-bridge. Other provisions, also, of the Act of 1911, like the requirement of " entry of vessels, and due report of other conveyances " before issue of the special license, show that it was not the purpose of Congress to make it applicable to the conduct of a toll-bridge or the operation thereon of a line of passenger trolley cars. The clause in the amendment of 1920 by which the extra compensation payable under § 5 is extended to cover overtime " in connection with the unlading, receiving, or examination of passengers' baggage " is given full effect, if applied to the baggage of passengers on those vessels for the immediate lading and unlading of whose cargoes special license may issue under the first four sections of the Act of 1911. That these were the only overtime services in connection with passengers for which the amendment made provision is confirmed by its history. The injustice of denying to customs officials compensation for such overtime services was obvious. But the Secretary of the Treasury had been advised, after the passage of the Act of 1911, as well as before, that he was without power to make—or to require the vessel owner to make—any payment therefor, since passengers' baggage is not " cargo ", 30 Ops. Atty. Gen. 123. To remedy this and other defects in the provision for extra pay, the amendment was introduced at the instance of the Treasury De-

partment, with the approval of the United States Shipping Board and of the American Steamship Association.[1]

Congress created two distinct systems for the examination of articles coming from foreign countries. One dealt with articles imported as merchandise; the other with passengers' baggage and personal effects. That distinction, established by the Act of March 2, 1799, c. 22, 1 Stat. 627, has been preserved in all later legislation. *One Pearl Chain* v. *United States*, 123 Fed. 371, 374. For merchandise there are elaborate provisions concerning entry, manifests, unloading, invoices, consular certificates and bills of lading. Revised Statutes, §§ 2581, 2867, 2962 and 2872, as amended by Act of June 26, 1884, c. 121, § 25, 23 Stat. 53, 59. There are special provisions affecting importations from Canada and Mexico. Revised Statutes, §§ 3097, 3098, 3099. Compliance with these requirements necessarily involves delays. Concerning passengers' baggage and effects the provisions are much simpler. They are designed to secure expeditious entry. Revised Statutes, §§ 2799, 2800, 2801 and 2802, deal with articles from foreign ports. There are additional provisions concerning

---

[1] Report of Committee on Commerce, Senate No. 306, 66th Cong., 1st sess. In presenting the report in the Senate on behalf of the Committee, Mr. Calder said: "We have had a law on the statute books for a number of years permitting the lading and unlading of vessels at night, for which the Government employees were paid in some such manner as is prescribed in this measure. But a year or two ago the Attorney General held that men could not be paid for passing upon the baggage taken off ships at night, but could be paid for supervising the discharging of the cargoes. That caused some difficulty, because we found a customs official examining baggage at night and being unpaid for it, and right alongside of him a customs official examining cargo and being paid for that." 59 Cong. Rec., Part 1, p. 640. See also 59 Cong. Rec., Part 2, pp. 2176–2178; Hearing of October 11, 1919, on Hours of Labor and Pay of Customs Inspectors on H. R. 6577, Committee on Ways and Means; Senate Report No. 660, 61st Cong., 2d sess.; House Report No. 1657, 61st Cong., 2d sess.

articles coming from contiguous countries. Revised Statutes, §§ 3100, 3101, 3102. That Congress intended by the Act of 1920 to abandon this distinction between merchandise and passengers' baggage which had been carefully preserved in the Act of 1911, is not to be assumed.

It is also insisted that the Secretary of the Treasury has authority, independently of the power specially conferred by the Act of 1911 as amended, to issue the instruction complained of. The contention is that his instruction to the Collector was not to compel the bridge company to pay the cost of the inspection service but merely to withdraw the service unless the company would agree to pay the cost; that since customs officials cannot be maintained at every point where merchandise may conceivably enter from contiguous countries, discretion must rest in the Secretary to determine whether the character and extent of the movement at a particular place justifies maintaining them there; and that the instruction given was a regulation under § 161 of the Revised Statutes which had the force of law. *Haas* v. *Henkel,* 216 U. S. 462, 480. To this contention it is perhaps a sufficient answer to say that the instruction given was obviously not a determination by the Secretary that the travel over these bridges on Sundays and holidays was not such as to justify the Government in maintaining the inspection service. The travel was heavier on those days than on any other; and the service had been maintained continuously for more than twenty years. But there are other conclusive answers. Section 161 does not confer upon the Secretary any legislative power. *Morrill* v. *Jones,* 106 U. S. 466; *United States* v. *George,* 228 U. S. 14. A regulation to be valid must be reasonable and must be consistent with law. The instruction given lacks both of these essentials. To collect the cost of customs service from vessel owners or others is virtually laying a tax upon them. This cannot be done except by specific authorization of Congress.

Moreover, unless so authorized, no official or employee may receive from the Government pay for extra services. Revised Statutes, § 1764; *United States* v. *Garlinger,* 169 U. S. 316. Nor may he receive in connection with his services pay from any private source, Act of March 3, 1917, c. 163, § 1, 39 Stat. 1106. Customs officials especially are forbidden to receive such payment. Revised Statutes, § 1790. Furthermore, to impose upon the company the obligation of furnishing an indemnity bond covering losses which may accrue to the Government from the action, not of the bridge company or of its employees, but of any passenger who crosses the bridge was clearly unreasonable. It was this lack of power in the Secretary to impose upon others any part of the cost of the customs service unless specially authorized by Congress which led to the enactment also of the earlier legislation concerning special licenses for lading and unlading of cargoes.[1] The instructions here attacked profess to rest, not upon Revised Statutes, § 161, but upon the Act of 1911 as amended by that of 1920, T. D. 38290; T. D. 38429. The claim of such authority by virtue of the power to establish regulations for the Department was apparently first made in this suit.

It is further contended that the petitioner has no standing to question the regulation which applies not to it, but to the owners of private conveyances and of personal baggage brought over the bridge. While these also might be entitled to seek redress, it is clear that the instructions given threaten vital interests of the bridge company to which a court of equity should afford protection. The

---

[1] See Act of March 3, 1873, c. 240, 17 Stat. 579; Revised Statutes, §§ 2871, 2872; Acts of June 26, 1884, c. 121, § 25, 23 Stat. 53, 59; June 5, 1894, c. 92, 28 Stat. 85; May 31, 1900, c. 600, 31 Stat. 249; December 16, 1902, c. 2, 32 Stat. 753; June 30, 1906, c. 3909, 34 Stat. 633. See also T. D. 28214, in re Act of 1906; T. D. 31562, in re Act of 1911.

jurisdiction of this court on appeal was also questioned. In support of the jurisdiction it is urged that the bill invoked rights under the Constitution as well as under the revenue laws; and treaty rights are also pressed upon us; *Spreckels Sugar Refining Co.* v. *McClain,* 192 U. S. 397, 407; *Merriam Co.* v. *Syndicate Publishing Co.,* 237 U. S. 618, 621. Whether the appeal lies we need not decide. A writ of certiorari was also applied for and the question presented is of sufficient importance to require determination by this court. *Montana Mining Co.* v. *St. Louis Mining Co.,* 204 U. S. 204, 213.

*Decree reversed.*