## NIAGARA FALLS BREWING CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.*

Circuit Court of Appeals, Second Circuit.
December 9, 1929.

No. 144.

Basil Robillard, of Niagara Falls, N. Y., for petitioners.

J. Louis Monarch and Norman D. Keller, Sp. Assts. Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and John McC. Hudson, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before MANTON, L. HAND, and MACK, Circuit Judges.

MANTON, Circuit Judge. The petitioner manufactured beer prior to the advent of the National prohibition. In reporting for

*Certiorari granted 50 S. Ct. 352, 74 L. Ed. —.

income and profit taxes for the years 1918 and 1919, it charged off obsolescence as a loss because its property, consisting of land, buildings, and machinery, became obsolete. On redetermination, it has been directed to pay the sum of $18,561.17 for 1918 and $5,013.65 for 1919. Feeling aggrieved by this order of redetermination, it has taken this appeal.

The facts found by the board have been acquiesced in by both petitioner and respondent. They may be stated briefly as follows:

The petitioner, a New York corporation, manufactured beer prior to the enactment of the Eighteenth Amendment to the Constitution and the acts of Congress (27 USCA) passed in the enforcement thereof. Its business and good will were all created by the manufacture and sale of this beverage, which is now forbidden to be manufactured and sold. It purchased its buildings and equipment in 1902, and thereafter constructed some new buildings, purchased and installed additional machinery, fixtures, and equipment, but these were especially constructed, designed, and adapted for the business of manufacturing beer, and were not available or readily adaptable to other uses. About July 1, 1918, the petitioner commenced to manufacture soft drinks in a separate building, with machinery distinct from that used in the manufacture of beer or cereal beverages, and kept separate accounts therefor on its books. It was obliged to discontinue the sale of beer, malt, and spirituous liquors after the forbidden time, and ceased doing so. It made near beer after it discontinued this manufacture of beer, but no part of the obsolescence or extraordinary depreciation taken by the petitioner for the years 1918 or 1919 was computed upon or taken on account of the depreciation of the buildings, machinery, and equipment used for the manufacture of soft drinks other than dealcoholized beer. The investment in equipment for the manufacture of soft drinks other than dealcoholized beer and the depreciation thereof was small for the years in question.

Prior to March 1, 1913, the plant and buildings were found by the board to have a value equal to the amount set up on the books of the petitioner of $476,265.16 on December 31, 1917. The total cost was $635,800.93; the accrued depreciation, $158,746.33. The book cost, found to be the true value by the board, was as to fixed assets on December 31, 1918, and December 31, 1919, respectively, $603,275.38 and $609,543.29, and there was charged off for obsolescence in the year 1918 $110,047.52, and for the year 1919 $57,139.99. It is these two items which the board has disallowed in fixing the income for each year. The rate of depreciation was fixed by the taxpayer. The obsolescence was taken only on the property which was used to brew beer. The deductions for obsolescence represented the amount necessary to be written off the assets to bring them down to an amount which the petitioners' directors thought could be realized at a forced or liquidation sale after the imminent prohibition legislation should become effective. The amount of deduction was determined after inquiry by the president of the petitioner as to what brewing machinery would bring in the case of prohibition, and deductions for depreciation and obsolescence were approved by the board of directors and the stockholders in the years charged off. The amount written off in the year 1919 was based, among other things, on the fact that the assets of a similarly situated brewing company in the same city had taken greater deductions for obsolescence than the petitioner and had sold in 1919 only a fractional part of the amount at which the assets remained on the books.

Other conditions found were, that the petitioner had to curtail the brewing of beer considerably more than theretofore, and that, in the event that it attempted to dispose of its machinery, it could not find a market because so much of that kind of machinery was being offered for sale. It entirely abandoned the manufacture and sale of beer in 1919. The petitioner considered selling or converting its building and machinery into plants for various other manufacturing and commercial purposes, but they could find no use for the building and machinery. The buildings were damp, the floor levels were uneven, they had no elevators, few openings for light, and were not readily adaptable for storage, manufacturing, or industrial purposes. The buildings were zoned, under the city zoning law, in an industrial or manufacturing zone. Much of the brewing machinery could not be removed from the buildings without tearing out the walls of the building or dismantling the machinery, and some of the machinery could not be dismantled without tearing out a side of the building. Having used its best efforts to sell the premises, the highest offer received was $35,000 cash, made by a paper company, which owned adjoining premises. Later the petitioner sold that portion of its land which was free from buildings for $20,000. The property was free of incumbrances.

The city assessor reduced the assessments very considerably, because it could no longer be used for brewing beer, and was unsuitable as a building for other manufacturing purposes, although in the same locality other property used for nonbrewing purposes was generally increased during the same period. When the taxpayer ceased manufacturing beer on October 28, 1919, it abandoned the lower floor, consisting of storage space in the building designated as No. 4. Space so abandoned had been used for storing and aging of beer. The cost of building No. 4 on December 31, 1917, was $67,913.74, and the depreciation accruing to that date was $23,875.37, making a total depreciation of $44,038.37. The cost of building No. 4 on March 1, 1913, was $67,913.74, and the depreciation accrued to that date amounted to $16,538.70, making a depreciation cost of $51,375.04. Building No. 3 was divided into two parts—easterly and westerly—and it was depreciated in 1917, the petitioner rebuilding inside of the easterly part of said building and reconstructing the storage cellar and new filtering and bottling machinery. The cost of this building on December 31, 1917, was $70,938.89, and the depreciation occurring to that date was $24,934.52, leaving a depreciated cost of $46,004.37. The cost of the building No. 3 on March 1, 1913, was $53,083.13, and the depreciation occurring to that date was $13,088.46, leaving a depreciated cost of $39,994.67. The cost on December 31, 1917, of the machinery and plant No. 3 was $27,453.09, and the depreciated cost of that date was $24,707.79. After October 28, 1919, and until January, 1922, the easterly part of the building No. 3, with the equipment therein, was used but once or twice a week making near beer, and aside from this it was not used for any other purpose. Prior to October, 1928, the easterly part of the building and equipment therein was used three or four times a week in making and bottling beer.

The taxpayer was dissolved as a corporation December 1, 1921, and its affairs of dissolution were administered by the directors as trustees in dissolution. Thereafter the building was leased for three months at an annual rental of $5,000, plus taxes, insurance, and repairs, to manufacture soft drinks. The lessee had no relation to the taxpayer, except that of tenant. The value of the machinery in 1918–1919, after prohibition became reasonably certain, was found to be not in excess of $10,475. At the end of 1918–1919 the land value was found to be $46,000 and the buildings $34,000. These amounts were less than the book values, after deducting for obsolescence the amount taken out by the petitioners for these years in its returns.

It is conceded that the difference in value in 1918 and 1919, and the depreciation cost of petitioner's machinery, buildings, and land on December 31, 1917, was due to incidence of war-time and permanent prohibition. There was no material change in the value of land and buildings in the vicinity of those of the petitioner, used for purposes other than brewing.

On these facts, the question presented was whether there was a deductible loss with respect to the property in 1918 and 1919 for obsolescence. Section 234 of the Revenue Act of 1918 (40 Stat. 1057, 1077) provided:

"(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * * (7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence; * * *"

The Treasury Department in its regulations provided in Regulation 45 as follows:

"Art. 143. *Loss of Useful Value.*—When through some change in business conditions the usefulness in the business of some or all of the capital assets is suddenly terminated so that the taxpayer discontinues the business or discards such assets permanently from use in the business, he may claim as a loss for the year in which he takes such action the difference between the cost or the fair market value as of March 1, 1913, of any asset so discarded (less any depreciation allowances) and its salvage value remaining. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property must be prematurely discarded, as, for example, where machinery or other property must be replaced by a new invention, or where an increase in the cost of or other change in the manufacture of any product makes it necessary to abandon such manufacture to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized. It does not apply to inventories or to other than capital assets. The exception applies to buildings only when they are permanently abandoned or permanently

devoted to a radically different use, and to machinery only when its use as such is permanently abandoned. Any loss to be deductible under this exception must be charged off on the books and fully explained in returns of income. But see articles 181–188."

If this regulation provides an additional condition, which must be satisfied before obsolescence deduction can be taken—that is, that the property must first be abandoned and that its usefulness must be terminated—the taxpayer would be deprived of the privilege of taking deductions of a reasonable allowance for obsolescence, unless he first abandons the assets. But this regulation does not apply. The statute provides for obsolescence, and not for obsoleteness. Obsolescence may and does occur, resulting in an estate more obsolete, when less used or more neglected, without forthwith rendering it entirely obsolete, useless, and fit only to be abandoned. "Obsolescence" is defined by Webster's Dictionary "as a state of becoming obsolete," "as no longer in use, disused, neglected"; and the Standard Dictionary defines "obsolescence" as a condition or process of gradually falling into disuse.

The existence of obsolescence in the earlier acts was recognized, but it was held not to be included in terms "depreciation," "exhaustion," "wear or tear," and obsolescence was permitted only when it had ripened into obsoleteness. This resulted in throwing the total deduction for obsolescence, as distinguished from depreciation, into one year. Congress then provided for the recognition of obsoleteness as a progressive process, as distinguished from obsolescence, which was an accomplished status. If there be obsolescence, without obsoleteness, it is clear that Congress intended to permit the deduction of the amount for obsolescence without abandonment of the assets. To impose another condition, the Treasury Department went beyond the statute. It created an additional burden upon the taxpayer, not provided for by the statute, and is unlawful. International R. R. Co. v. Davidson, 257 U. S. 506, 42 S. Ct. 179, 66 L. Ed. 341; United States v. George, 228 U. S. 14, 33 S. Ct. 412, 57 L. Ed. 712; Williamson v. United States, 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed. 278. Moreover there was an abandonment of the business, the use of the machinery and of the buildings, except for the short period when a portion thereof was used for the manufacture of soft drinks.

We said in Haberle Crystal Springs Brewing Co. v. Clarke, 30 F.(2d) 219, 220, where claim of obsolescence for good will was made: "A brewery may fairly be regarded as obsolete after prohibition, and as subject to obsolescence during the period between the date when such legislation became certain and the date when it went into effect. The taxing authorities do not deny that legislation which shortens the useful life of tangible assets entitles the taxpayer to an allowance for obsolescence under the 1918 act. Appeal of Manhattan Brewing Co., 6 B. T. A. 952, which allowed obsolescence of tangibles, but not of good will, because of the imminence of prohibition."

Upon the conceded facts here, the amounts claimed for obsolescence were justified, and should have been allowed.

Determination reversed.