McLAUGHLIN & FREEMAN *v.* UNITED STATES (No. 3678)[1]

[1] T. D. 46949.

United States Court of Customs and Patent Appeals, February 12, 1934

*John T. Noonan* and *Joseph F. Lockett* for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*William Whynman*, special attorney, of counsel), for the United States.

[Oral argument October 6, 1933, by Mr. Noonan and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Judge, delivered the opinion of the court:

The appellant imported certain wool in the grease at the port of Boston, and made three entries thereof, on December 18, 1931. The collector classified the wool, in each case, under paragraph 1102 (b) of the Tariff Act of 1930, on the basis of its clean content. This paragraph, together with other relevant provisions, is as follows:

PAR. 1102. (b) Wools, not specially provided for, and hair of the Angora goat, Cashmere goat, alpaca, and other like animals, in the grease or washed, 34

cents per pound of clean content; scoured, 37 cents per pound of clean content; on the skin, 32 cents per pound of clean content; sorted, or matchings, if not scoured, 35 cents per pound of clean content.

PAR. 1104. The Secretary of the Treasury is hereby authorized and directed to prescribe methods and regulations for carrying out the provisions of this schedule relating to the duties on wool and hair. The Secretary of the Treasury is further authorized and directed to procure from the Secretary of Agriculture, and deposit in such customhouses and other places in the United States or elsewhere as he may designate, sets of the Official Standards of the United States for grades of wool. He is further authorized to display, in the customhouses of the United States, or elsewhere, numbered, but not otherwise identifiable, samples of imported wool and hair, to which are attached data as to clean content and other pertinent facts, for the information of the trade and of customs officers.

The entries were liquidated on January 13, 14, and 15, 1932, after which the importer removed its wool to its processing plant at Harrisville, R.I.

On March 11, 1932, the importer protested in identical protests, as follows:

1. That the duty was assessed with respect to this entry upon the basis of the estimated scoured yield of the wool and not upon its clean content, i.e., clean content determined on the basis of eliminating from the wool in its scoured state all foreign vegetable matter (which is usually done by the process of carbonization), as required, as we contend, by the paragraph of the statute above referred to.

2. That the duty was assessed with respect to this entry without allowance for excessive moisture in the wool.

3. That the duty with respect to this entry was not assessed with respect to the true clean content (i.e., clean content carbonized) of the wool, as required, as we contend, by the paragraph of the statute above referred to, but was assessed on the basis of a yield materially in excess of the wool's true clean content.

The wool in this entry was assessed on the basis of an approximate average yield of 58.62% of its greasy weight. We claim that the yield of clean content (i.e., clean content carbonized) did not exceed an average of 55.58% of the greasy weight.

In response to the protest the collector stated in part:

Duty was assessed on the basis of the appraiser's estimates of clean content in accordance with the regulations of September 23, 1922, Circular letter of the Secretary of the Treasury, No. 612. The importer did not avail himself of the provisions of T.D. 39767 for a scouring test when the importer is dissatisfied with the return of clean content found by the appraiser.

He also copied and referred to the advisory report of the appraiser, as follows:

These protests object to the clean content reported for the wool comprised in the above entries.

The wool was appraised for duty on the basis of clean yield and as no manipulation was done by the importer to show that the estimates for the appraiser were wrong, the estimates as originally reported are not changed.

On appeal to the United States Customs Court, a trial was had, at which two witnesses were called and examined on behalf of the

protestant. Levon M. Mardros Yacubian, manager of the top department at Harrisville, testified that the Stillwater Worsted Mills, the owner of the Harrisville plant, was in the business of converting greasy wool into men's finished worsted goods. He then detailed with particularity the processes to which the wool in question was subjected. Without going into detail, it will be sufficient to state that the wool was subjected to many processes, including scouring in a four-vat machine, drying, carding, back washing, drying, oiling, gilling, balling, combing, gilling, wetting, and packaging.

Thereafter, the witness offered to prove that the resulting clean wool was weighed and was found to weigh 70,153 pounds as against the determination by the appraiser of 74,530 pounds, and as distinguished from its entered clean weights of 74,069 pounds. The testimony of the witness Hincliffe substantially verifies the figure stated in said offer.

This testimony also shows that the witness did not know what methods were used by the appraiser in determining the clean content. Neither is this shown elsewhere in the record.

The witness Yacubian further testified that the methods used by him in processing this wool were the same as those defined in T.D. 39767.

On this record the trial court held, the cases having been consolidated, in a decision by Sullivan, J., McClelland, J., specially concurring, and Brown, J., dissenting, that the importer had not proceeded in conformity with the provisions of T.D. 39767 in ascertaining the clean content of its wool, and overruled the protest.

The importer has appealed from the resulting judgment. In this court, counsel for the importer insist that the said T.D. 39767 is illegal and void, because it purports to require the importer to pay an additional tax, namely, the charge for processing. It is claimed, further, the importer followed the process defined in said T.D. 39767, that the Government did not, and that the weights ascertained by the processes of the importer are the correct, dutiable weights of the clean content of the wool, and should be taken; that the importer had the right, under the circumstances of the case, to prove the true clean content of its wool; and, finally, that said T.D. 39767 was not material and relevant to the protests in issue.

The Government insists that the validity of said T.D. 39767 is not properly raised in this court, it, as the Government contends, not having been raised in the trial court; that if it is properly raised, the regulation is valid; that the importer failed to show compliance with said T.D. 39767; that the importer had no right to use other methods in ascertaining clean content; and that the importer introduced no competent proof to show clean content.

Many interesting questions are raised by the parties on this appeal. As we view the matter, however, a discussion of but one of the points raised will be sufficient for the disposition of the case.

The pertinent regulations at the time of this importation were Circular Letter No. 612, of September 23, 1922, and T.D. 39767, of August 16, 1923. The importer contends that these were repealed by the enactment of the Tariff Act of 1930, and bases its contention upon the claimed authority of *United States* v. *McGraw Wool Co.*, 19 C.C.P.A. (Customs) 205, T.D. 45296. Counsel are in error about the holding in the cited case. Our conclusion there was not that the enactment of a new tariff law necessarily annulled regulations issued under a former act, but only did so where the new act failed to continue authority in the Secretary of the Treasury to issue such regulations. Where such authority was continued, the existing regulations were continued effective until abrograted or modified by regulations issued under the new act.

The collector reported, in this case, as follows:

Duty was assessed on the basis of the appraiser's estimates of clean content in accordance with the regulations of September 23, 1922, Circular letter of the Secretary of the Treasury, No. 612. The importer did not avail himself of the provisions of T.D. 39767 for a scouring test when the importer is dissatisfied with the return of clean content found by the appraiser.

Said circular letter, or Treasury regulation, No. 612, was in force at the time of the ascertainment by the appraiser of the clean content of the wool here involved.

Said Circular Letter No. 612 is as follows:

*September 23, 1922.*

REGULATIONS GOVERNING THE ENTRY AND WITHDRAWAL OF WOOL

*To Collectors of Customs and Others Concerned:*

In order to facilitate the entry and delivery of wool, the following temporary regulations are promulgated for the guidance of customs officers:·

(1) On the entry or withdrawal of wool dutiable on the clean content under the provisions of paragraph 1102 of the tariff act of 1922, the importer will be required to file with the entry or withdrawal a statement showing the number of bales, the marks, grade or quality, weight, unit price, and estimated shrinkage and yield, in substantially the following form:

| Entry no. | Marks | Grade or quality | Weight | Unit price | Shrinkage | Yield |
|-----------|-------|------------------|--------|------------|-----------|-------|
| | | | | | | |
| | | | | | | |
| | | | | | | |

The total estimated or clean content shall be stated in the entry or withdrawal.

(2) In the absence of such statement, or when such statement is obviously incorrect, the collector will take estimated duty on the full weight as the clean content.

(3) The collector shall designate not less than one bale out of such lot or grade for examination at the public stores.

(4) The appraising officers will follow commercial methods in determining the clean content of wool, and the clean content reported by the appraiser will be accepted by the collector in the assessment and liquidation of duties.

(5) If the clean content reported by the appraiser differs from the estimate filed with the entry or withdrawal, the importer shall be immediately notified, and if he does not agree with the appraiser's findings, representative samples of the lot or lots on which there is a disagreement shall be scoured and the clean content determined by laboratory or factory methods.

W. G. Platt, *Acting Assistant Secretary.*

It will be observed that the fifth clause of this Treasury letter provides that if the clean content reported by the appraiser differs from the estimate filed with the entry, "the importer shall be immediately notified."

It must be presumed that this duty was performed by the customs officers. There is nothing in the record which intimates anything to the contrary.

T.D. 39767 is as follows:

Treasury Department, *August 16, 1923.*

*To Collectors of Customs and Others Concerned:*

The following regulations should be followed for the scouring of wool where importers appeal from the estimate of the clean content found by the customs officers:

When there is a difference of opinion between the importer and the appraiser as to the estimate of clean content that shall apply to a certain lot of wool, the following rules and regulations governing the method of scouring wool must be used:

Representative samples of the lot or lots on which there is a dispute shall be sent to a well-known and properly equipped scouring plant, there to be scoured by the four or five vat system, with water from 115 to 135 degrees Fahrenheit, and with the solutions properly adapted to the particular type of wool being scoured. Sample of scoured wool shall then be reduced to bone-dry weight by the use of recognized standard apparatus, and 13¾ per cent regain added thereto as determined by the Bureau of Standards.

Results of the test must be reported in the form of a sworn affidavit that the scouring has been done in accordance with the above regulations.

Expense of having scouring done shall be borne by the importer.

McKenzie Moss, *Assistant Secretary.*

The preamble of this Treasury decision is somewhat confusing in this respect, that it states "where importers appeal from the estimate of the clean content." However, in view of the language of said Circular Letter No. 612, we are of opinion that this language should be construed as meaning that where, after the importer has received its notice of a difference between its estimate and that of the appraiser, it is not satisfied, it should indicate the same, as provided by said paragraph 5 of said Circular Letter No. 612.

In any event, T.D. 39767 must be considered as supplementary to said Circular Letter No. 612, and not supplanting or abrogating the same, except as to the method of scouring, in the event the importer expressly disagrees with the appraiser's findings.

It will be observed that this Treasury regulation gave to the importer, if it questioned the correctness of the estimate of the appraiser, the right to proceed to an ascertainment of the clean content, as provided for in said T.D. 39767; that is, it might have the representative samples sent to a scouring plant for processing as therein provided.

The record, however, discloses that the importer did not attempt to avail itself of the procedure mentioned in T.D. 39767. It is a mistake to assume that the appraiser proceeded under T.D. 39767. As a matter of fact, he proceeded under the authority of said Circular Letter No. 612, in his ascertainment of clean content. What particular method he followed does not appear, nor is it essential here. The fact remains that it is presumed, as a matter of law that he proceeded in conformity with the law and regulations, especially so in the absence of any showing to the contrary. The witness Yacubian, for the importer, testified that he did not know how the appraiser proceeded, or what methods he used. The conclusion must be, therefore, that the estimate and appraisement were properly made by the local appraiser.

In this view of the matter, the question of the validity of said T.D. 39767 becomes immaterial in this case. There was no attempt to proceed under it, either by the importer or by the Government.

The importer, after having been notified as provided in said Circular Letter No. 612, we must assume from the record, did not indicate to the officials of the customs any disagreement with the estimate of clean content, as ascertained by the appraiser, and, hence, the provisions of said T.D. 39767 were not called into operation.

It may be said the importer was not obliged to have recourse to T.D. 39767, because it was invalid. If this be conceded, the appraisement was nevertheless conducted under a regulation which is concededly valid, and the importer must, if it is to prevail here, establish that, in some way, while proceeding under said Circular Letter No. 612, the customs officers deprived it of rights which it was entitled to under the law.

Upon receipt of the wool in question by the importer, it removed it to its plant, the Stillwater Worsted Mills, at Harrisville, R.I., and there subjected it to many processes. It was repeatedly processed, far beyond the provisions of Circular Letter No. 612. After this had been done, the importer weighed the results of its processes, estimated the clean content, and then insisted that this clean content be taken as the dutiable quantity. There is no attack upon the processes used by the Government. The only claim is that the processes used by the importer were substantially in compliance with T.D. 39767, and were correct.

The importer was, therefore, substituting its own methods of arriving at the dutiable content in lieu of the method provided by law and the customs regulations. This it may not do. We have held that where certain customs regulations are in force, and the Government itself does not comply with such regulations, the importer may show this, and may, if it has followed such regulations, establish the true dutiable value or quantity of its goods. *Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38, T.D. 41548; *Penick & Ford* v. *United States*, 12 Ct. Cust. Appls. 432, T.D. 40611. We have never held, however, that an importer may disregard reasonable regulations promulgated by the Treasury Department, using a method of its own and then be permitted to establish dutiable quantity or quality by the results of the substitute method it has utilized. To do so would be to practically destroy the power of the Treasury Department to make such customs regulations.

While we do not find ourselves in harmony with all that has been said in the decision of the trial court, we concur in the conclusion reached, and the judgment of the United States Customs Court is *affirmed.*

### CONCURRING OPINION

GARRETT, Judge, specially concurring: Did I believe T.D. 39767 to be a crucial factor in this rather perplexing controversy, my conclusion might be different, because I am not convinced that the provision thereof requiring the importer to pay charges for the tests provided "when there is a difference of opinion between the importer and the appraiser as to the estimate of clean content" is valid. I am of the opinion, however, that under the facts of record, there is no occasion to pass upon that question.

The case is peculiar in that appellants, while insisting before us, as they did before the trial court upon the rehearing there granted, that the said T.D. 39767 is invalid and therefore not binding upon them, at the same time claim to have proven that the tests made by them in their own scouring plant were in substantial compliance with its terms, so far as the method of scouring is concerned.

Assuming, without holding, that this was satisfactorily established, the fact remains that such tests were made after the wool had been released from customs custody, with duty assessed, and presumably paid, upon the basis of clean content fixed by the local appraiser, the correctness of which had not been challenged, or in any wise objected to, so far as the record shows, while the merchandise was in such custody.

Sound public policy would seem to require that the clean wool content be determined before there be a release of the wool by the customs officials, or at least that any issue in regard to such content should be raised during that period and made in some way to appear.

It certainly cannot be conducive to a sound administration of the customs laws to permit an importer to withdraw merchandise, the dutiable amount of which is to be determined as is that of wool, make his own tests entirely outside Government supervision—indeed without any knowledge on the part of Government officials that he is doing so—and, upon making proof as to what those tests show, have the dutiable quantity determined by such evidence, especially without having ever theretofore indicated, in any manner, any difference of opinion as to the quantity officially declared by those charged with the performance of that duty on behalf of the Government.

Even if it be conceded that such regulations as may have been in force at the time this controversy arose were not happily drawn and that methods of procedure were not satisfactorily defined, the fact still remains that the appraiser had a statutory duty to perform with respect to finding clean content, and that, in this case, he tried to perform that duty. The correctness of his actions was not questioned until the Government had lost all control over the merchandise itself and all opportunity to test it, according to the regulations, or in any other manner, for the ascertainment of the correct facts, if the original findings of fact were found to be erroneous.

There was some intimation during argument of the case that when the local appraiser determined that the amount was greater than the entry claim, the difference of opinion became manifest and that it was the duty of the appraiser then and there to invoke T.D. 39767—in other words, that the burden of initiating action rested upon the proper Government official rather than upon the importers.

To this I cannot subscribe. In the very nature of things, the importers must have received notice that the entered estimated quantity was advanced by the appraiser. The contest here is solely over the question of amount; classification is not involved.

I cannot but feel that the issue as to this amount should have been raised in some manner by the importers while the wool was in customs custody and it is not incumbent upon the court, as I view the question, to declare here how it might properly have been raised. The courts have no authority to make regulations for the administrative officials.

It is not meant to indicate a belief that it was necessarily incumbent upon the importers at that time to question the validity of T.D. 39767, and most certainly it was not incumbent upon them to invoke it if, as I strongly feel, it was invalid, at least in part—a part which it must be said seems quite vital to the integrity of the whole.

But the said Treasury decision was not invoked by anyone. So far as the record shows, it was never mentioned until the collector made his report to the United States Customs Court, and hence it was never a factor in the proceedings before the administrative

officials. No finding of quantity was based upon it, and the suit here is not for the recovery of any duty resulting from its application.

DISSENTING OPINION

BLAND, Judge: I must respectfully dissent from the opinion of the majority, and in doing so, I must commend rather than criticize the desire of the majority to avoid passing upon the validity of a Treasury regulation of the importance of the one involved here. Courts should never strike down as invalid such a regulation unless it is unavoidable and unless its invalidity is clear.

I am convinced that T.D. 39767 is wholly invalid, and furthermore, I am confident that no satisfactory decision of the issues in this case can be arrived at without passing upon the validity of the regulation. In order to avoid passing upon the validity of T.D. 39767, the majority have been compelled to hold, erroneously, I maintain, that Circular Letter 612 was in full force and effect at the time the instant importation was made, and to make further holdings, based upon said circular letter, which are unwarranted.

The majority opinion is objectionable chiefly for three reasons: First, it holds that Circular Letter 612 was in full force and effect in December 1931; second, after holding that Circular Letter 612 and T.D. 39767 were both in full force and effect, it bases its holding upon the presumption that the appraiser proceeded in his ascertainment of the clean content of the wool under the authority of Circular Letter 612 and not under the authority of T.D. 39767; third, in holding that the question of the invalidity of T.D. 39767 was immaterial. In the majority opinion is found the following:

In any event, T.D. 39767 must be considered as supplementary to said Circular Letter No. 612, and not supplanting or abrogating the same, except as to the method of scouring, in the event the importer expressly disagrees with the appraiser's findings.

It will be observed that this Treasury regulation gave to the importer, if it questioned the correctness of the estimate of the appraiser, the right to proceed to an ascertainment of the clean content, as provided for in said T.D. 39767; that is, it might have the representative samples sent to a scouring plant for processing, as therein provided.

The record, however, discloses that the importer did not attempt to avail itself of the procedure mentioned in T.D. 39767. It is a mistake to assume that the appraiser proceeded under T.D. 39767. * * *

\* \* \* \* \* \* \*

The importer, after having been notified as provided in said Circular Letter No. 612, we must assume from the record, did not indicate to the officials of the customs any disagreement with the estimate of clean content, as ascertained by the appraiser, and, hence, the provisions of said T.D. 39767 were not called into operation.

It may be said the importer was not obliged to have recourse to T.D. 39767, because it was invalid. If this be conceded, the appraisement was nevertheless

conducted under a regulation which is concededly valid, and the importer must, if it is to prevail here, establish that, in some way, while proceeding under said Circular Letter No. 612, the customs officers deprived it of rights which it was entitled to under the law.

Circular Letter No. 612 was never printed in the TREASURY DECISIONS or in any volume of customs regulations. It found its way into our opinion in *Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38, T.D. 41548. It is dated September 23, 1922 (two days after the Tariff Act of September 21, 1922, went into effect), and in the heading is found the following: "* * * the following *temporary* regulations are promulgated for the guidance of customs officers." (Italics mine.) It is obvious from an inspection of the letter that it was a letter hastily written to the collectors telling them what to do until they could get a suitable regulation promulgated. It must be remembered that when the Tariff Act of 1922 was passed, taxing wool on the clean content was new in customs law.

In *Gallagher & Ascher* v. *United States, supra*, the importers questioned the applicability of this circular letter by contending that it had not been sufficiently promulgated to have the force of a Treasury Department regulation. This court held that there was nothing contained in that record to show that it had not been properly promulgated and treated the circular letter as a valid regulation for the purposes of that case. There is nothing contained in this record which would indicate that as between the date of its issuance and the date of the promulgation of T.D. 39767, August 16, 1923, it should not have been treated as a valid regulation although it seems clear now that it consisted of nothing more than an instruction to the collectors and was not promulgated for the information of the trade generally. This condition, however, was remedied by the Treasury Department on August 16, 1923, by promulgating and printing at pages 84 and 85 of Volume 44, TREASURY DECISIONS, a permanent regulation which was at that time evidently intended to fully meet all requirements in determining clean content of wool in the grease.

I will not consume space here for setting out the two documents in controversy. They will be found in the majority opinion. The latter regulation is wholly inconsistent with and a complete change from the circular letter. That T.D. 39767 took the place of the circular letter; that from the date of the promulgation of T.D. 39767, Circular Letter No. 612 was no longer in force and effect; that such result was not only the intent of the Treasury Department; and that no other reasonable effect could result, seem to me to be too clear to call for extended argument. The practice of the Treasury Department for more than a century has not been to repeal a regulation by express language. The new regulation may be supplemental to the old one, and ordinarily when supplemental it so states. The new one takes the place of the old one unless it is made supplemental thereto.

The new one, if on the same subject matter, ordinarily embraces some of the features of old ones. See Article 768, Customs Regulations of 1931.

T.D. 39767 remained in full force and effect until January 6, 1932, when features of it and other provisions were consolidated into Article 768, *supra*. The latter regulation remained in full force and effect until the promulgation on April 11, 1932, of T.D. 45568 which is the one now in force. In neither of these regulations is there any attempt to repeal or disavow the applicability of the former regulation. Will it be contended by anyone that T.D. 39767 is now in force and effect?

The meaning of the collector's report, which, by the way, is not in the record, is not clear. It is doubtful whether he intended to say whether the appraiser proceeded under Circular Letter No. 612 or whether he (the collector) assessed duty in accordance with the requirements of Circular Letter 612. At any rate he was wholly unjustified in dragging Circular Letter No. 612 into the case. Moreover, I know of no reason to regard, as binding here, anything said by the collector as to what the appraiser did. However, he did say that "The importer did not avail himself of the provisions of T.D. 39767." So, in my judgment, there was only one regulation in effect when the importation at bar was made and that was T.D. 39767. It provides that it is to apply where *importers appeal from the estimate of clean content found by the customs officers*. There is no such thing in law known as an appeal from the estimate of the clean content and obviously the treasury decision meant that the instruction should apply when the importer disagreed with the appraiser, because in the following paragraph it states "When there is a difference of opinion between importer and appraiser" the rules following should be applied. It then states that representative samples of the lot in dispute shall be sent to a well known and properly equipped scouring plant and scoured, treated, and the results reported under certain conditions provided in the regulations. At the end of the regulation is this unfortunate provision: "Expense of having scouring done should be borne by the importer." There is nothing in this regulation about notice being given to the importer. There was in Circular Letter No. 612. It will be remembered that the letter was never printed in the TREASURY DECISIONS.

Regulations of the kind involved here, however, are handled in a practical way. The importer or his representative, obviously, is in close touch with the appraiser in matters of this character. Any disagreement between them as to the clean content of wool is not a matter of which either of them should, in every instance, require a formal notice. If there is a difference of opinion, the importer can insist that representative samples be sent to the independent scouring plant. But, suppose the importer declines to have samples of his

wool sent to the independent scouring plant because he objects to paying the charges and is of the opinion that the regulation is totally and wholly invalid. What is he to do then? If I understand the attitude of the majority, it is that importer cannot wait and protest an incorrect liquidation based upon the wrong quantity of goods, but must serve some kind of notice upon the appraiser.

The opinion of the majority, however, seems to me to be subject to the objection that it does not definitely state what the importer is to do in event he is dissatisfied, or which regulation would be brought into operation in event he did something after having been notified. The opinion does say:

It will be observed that this Treasury regulation gave to the importer, if it questioned the correctness of the estimate of the appraiser, the right to proceed to an ascertainment of the clean content, as provided for in said T.D. 39767; that is, it might have the representative samples sent to a scouring plant for processing, as therein provided.

The record, however, discloses that the importer did not attempt to avail itself of the procedure mentioned in T.D. 39767. It is a mistake to assume that the appraiser proceeded under T.D. 39767.

I take it that this is a holding that if he was dissatisfied and did express such dissatisfaction, then this brought the force of T.D. 39767 into operation and that then the test would be made under that regulation. In other words, the only thing he could have done was to have asked that representative samples be sent to an independent scouring plant in pursuance of a regulation he deemed invalid, because certainly it cannot be argued that after receiving notice and after he had expressed dissatisfaction that anything would have been done under Circular Letter 612 as long as the specific method provided for in T.D. 39767 was in existence. The facts in this case show the contrary. The collector and the court below held that the importers had not complied with T.D. 39767.

There is nothing in any regulation or in the statute that requires an importer in a case of this kind to show that he, either orally or in writing, affirmatively expressed any dissatisfaction. The only purpose of expressing dissatisfaction would be to bring into operation the test provided for in the regulation, and I hardly think anyone would contend that if it were conceded that the regulation was invalid, he would be required to do something that would subject him to the provisions of the invalid regulation.

It is my position that since importers deemed the regulation invalid, they were not required to do anything which would subject them to the invalid charge in the regulation and that if the regulation was in fact invalid, they had the right to wait until liquidation was made upon the wrong amount and then bring forward their proof of the wool's clean content. This they did in most convincing form, and

the fact that there was approximately 5 per centum less clean wool than either they or the appraiser originally estimated is not surprising when we contemplate that the Government has no provision for scouring wool, and the appraiser's estimate is always merely an estimate based on an arbitrary figure, and that different shipments of wool differ vastly in clean content owing to excessive grease, burs, and various foreign matter.

If we assume that T.D. 39767 was the only regulation in effect and that it was invalid, I take it that no one will contend that the appellants are barred from proving the clean content of their wool upon protest. Certainly no one has made any contention to that effect, although it has been contended at one stage of this proceeding that the invalidity of the regulation should have been attacked in the protest, which contention is, in my judgment, wholly untenable. Neither has anyone contended or pointed out, in any particular, where appellants' proof of the clean content found is not completely probative of the issue. It is contended that their method is not the exact method prescribed in T.D. 39767. If T.D. 39767 is invalid, it is difficult to see the materiality of this contention. The Government produced no witnesses, and the testimony of appellants stands unquestioned, and is full and complete. That the method employed by the Stillwater Worsted Mills was a proper commercial method for scouring wool and for ascertaining its clean content has not been questioned. It was so near the identical method of the regulation that the Government could find no basis for a contention that the method employed would not bring the correct result.

Now, if T.D. 39767 was valid, I am of the opinion that it was the duty of the importers to invoke the application of its provisions, and that under *Gallagher & Ascher* v. *United States, supra,* and other authorities, they were not at liberty to take the entire quantity of wool and process it and then be permitted to impeach the appraiser's estimate. They could only do it by proceeding in accordance with the provisions of the regulation.

Therefore, in this view of the case, passing upon the validity of T.D. 39767 is absolutely unavoidable, and while I am on this phase of the case I will here very briefly discuss one phase of that question. In view of certain provisions in subsequently promulgated customs regulations relating to scouring and testing wool, I am fully cognizant of the importance of the issue, but it is far better to meet the issue squarely now, whatever the consequences may be, than to postpone the evil day and at the same time make an erroneous and unwarranted holding, the harmful consequences of which may not now be fully appreciated.

I think the regulation invalid for one reason because, in the language of the Supreme Court of the United States, it "is virtually laying a

tax" upon this particular importer of wool by a Treasury legislation rather than by congressional legislation.

In the case of *International Ry. Co.* v. *Davidson*, 257 U.S. 506, the following pertinent facts appeared: The International Railway Co. owned and operated two public toll bridges across the Niagara River between the United States and Canada. Over each of the bridges there was a heavy passenger travel. The Government, for a long while, had maintained at the American end of the bridges customs inspectors, continuously day and night, including Sundays and holidays. The Collector of Customs at the port of Buffalo, following instructions of the Treasury Department, notified the company that on Sundays and holidays thereafter, no vehicles (except trolley cars) would be permitted to enter the United States; that no passenger would be allowed to enter except after surrender to the customs guard of all personal baggage, and that all vehicles (except trolley cars) and all baggage surrendered would be held by the collector at the owner's risk for examination on the next working day. The company was further notified that continued service of customs inspectors on Sundays and holidays could be secured, if it would make application for a special license under a certain act of Congress, and that day and night customs service on ordinary week days was to be continued at the expense of the Government. It further appeared that to obtain the said license it was necessary for the applicant to agree to pay to the Collector of Customs an amount equal to the extra compensation of the customs officers employed therefor at night or on Sundays or holidays, or to give bond, etc. The compensation payable for such overtime was fixed by the Secretary of the Treasury at double the day rate. The heaviest travel over the bridges was on Sundays and holidays. In reversing the decree of the lower court which denied the relief sought by the railway company, the court gave the following as one of the reasons for so doing:

* * * A regulation to be valid must be reasonable and must be consistent with law. The instruction given lacks both of these essentials. To collect the cost of customs service from vessel owners or others is virtually laying a tax upon them. This cannot be done except by specific authorization of Congress. * * *

It would be difficult to distinguish the logic of that decision from that which should apply to the facts at bar. While it is true that the importation of goods into this country is not a vested right in anyone, *Buttfield* v. *Stranahan*, 192 U.S. 470; *Board of Trustees of the University of Illinois* v. *United States*, 20 C.C.P.A. (Customs) 134, T.D. 45773, affirmed 289 U.S. 48, and can only be done by complying with the terms determined by Congress, when Congress has granted the right to import goods upon the payment of certain duties, the importer should not have laid upon him the cost of determining the quantity

of the importation or the proper duties to be levied thereon unless this charge is also required or authorized by the statute. Unquestionably, Congress may require the importer to pay such charges, but the statute under consideration here contains no such requirement.

See also *United States* v. *Rosenburg & Sons*, 253 Fed. 285.

It must be remembered that the importer has no opportunity of protesting the illegal exaction of the charges for scouring. The Government does not pay these charges to the scourer. The importer pays them, and when he invokes the provisions of T.D. 39767, he obligates himself to the scourer and not to the Government.

So much for that phase of the case. Now let us assume, for the sake of argument only, that Circular Letter No. 612 and T.D. 39767 were both in full force and effect at the time the instant importation was made. My associates hold, for reasons which are neither expressed nor apparent, that as a matter of fact the appraiser proceeded under Circular Letter No. 612, although they state that the particular method he followed does not appear. According to the majority, he must have first proceeded under paragraph 4 of Circular Letter No. 612. There is a commercial method, or at least a well-known practice which wool experts observe, in estimating clean content of wool, without scouring a single fiber of it, where the estimate will be within 1 per centum of the accurate weight. "Wool" by Stanley H. Hart, 1924, chapter V, page 139. If we are considering Circular Letter No. 612 as being in force, we must then look to paragraph 5 because there it says that if the content reported by the appraiser differs from the estimate filed with the entry, then, after notice, if the importer does not agree with the appraiser's finding, the clean content must be determined by laboratory or factory methods from representative samples of the lot or lots. What kind of laboratory or factory methods? If the majority are right and this regulation was in force, importer might insist on one method and the appraiser on another, and that is exactly the reason why a permanent regulation was regarded as important, and the provisions of T.D. 39767 were provided for and promulgated, and took the place of the circular letter.

But, let us continue to assume that both are in full force and effect, and the importer has been notified of the disagreement according to the circular letter. If T.D. 39767 is in force and valid, and he disagrees, he could not avoid its application because the method there is a definite and specific one and controls over the general provision in paragraph 5 of the circular letter. If the regulation is invalid, he then becomes liable to an illegally imposed charge which he cannot protest in the way provided by statute. So, if we take this route, we run squarely against the question, Is T.D. 39767 valid?

If he had then and there pointed out that the regulation was invalid, what possible effect on the issues of this case could it have had? What warrant for such a requirement is in existence? That one does not have to comply with the preliminary requirements leading up to an invalid requirement is too well settled to require citation or discussion here. If the *importers* did not have to comply with the regulation, they did not have to do anything with respect to it. They could ignore it.

The gist of the decision of the majority is that the estimate of the appraiser is presumed to be correct and that he is presumed to have proceeded in accordance with law (under Circular Letter No. 612); that the *importer* is presumed to have had notice of this holding and that it was then his duty, if dissatisfied, and if he "desires a further test" to invoke the application of the method indicated in T.D. 39767. The following sentence from the majority opinion is again quoted:

In any event, T.D. 39767 must be considered as supplementary to said Circular Letter No. 612, and not supplanting or abrogating the same, except as to the method of scouring, in the event the importer expressly disagrees with the appraiser's findings.

So it is clear from the majority opinion that the only thing the importers could do, other than what they did do, if dissatisfied, was to invoke the provisions of an invalid regulation, and the majority hold that whether it is valid or invalid makes no difference in the decision of this case and that we do not have to pass upon the validity of the questioned regulation. With this conclusion I am in unalterable disagreement.

If T.D. 39767 is to be left out of consideration and we hold that importers had their notice and it was then their duty to see that a test was made under Circular Letter 612, we then find ourselves in considerable difficulty because the method described in Circular Letter 612 merely provides that the clean content shall be determined by "laboratory or factory methods." It is admitted in this case that the method pursued by the importers in determining the clean content was a proper commercial method. It of course was contended that they had not complied with the method of T.D. 39767 and the collector found that they had not complied with that method and the court below overruled the protests because they had not complied with it.

It is because I agree absolutely with the finding of the court that the specific method of T.D. 39767 would have to be applied to importer's merchandise in event he disagreed with the appraisement that I regard it as absolutely necessary that this court pass upon the question of the validity of T.D. 39767.

I am at a loss to know what kind of a precedent this decision is going to make for litigation of this character in the future. In event an importer does not want to submit himself to an illegally imposed regulation, is it going to be incumbent upon him to file something and get it into the record, or that he prove that he performed some affirmative act which made him subject to the illegal charge before he is privileged to contest the quantity of the imported merchandise upon protest? I respectfully submit that the majority opinion, in its present form, would seem to imply this anomalous result. I know of no supporting authority for such a holding.

For the reasons aforesaid, it is my view that upon this record the United States Customs Court should have sustained the protests and this court should so hold.