McCann L. REID, Plaintiff-Appellant and Cross-Appellee,

v.

MEMPHIS PUBLISHING COMPANY, Defendant-Appellee and Cross-Appellant.

Nos. 74–1761, 74–1762.

United States Court of Appeals, Sixth Circuit.

Aug. 20, 1975.

Rehearing Denied Nov. 5, 1975.

Armistead F. Clay, Memphis, Tenn., for McCann L. Reid.

National Jewish Commission on Law and Public Affairs, Brooklyn, N. Y., amicus curiae.

David E. Caywood, Memphis, Tenn., Louis R. Lucas, William E. Caldwell, Memphis, Tenn., for Memphis Pub. Co.

Before WEICK, EDWARDS and CELEBREZZE, Circuit Judges.

WEICK, Circuit Judge.

Appellant Reid has appealed from an order of the District Court denying his motion to assess attorney's fees against appellee, Memphis Publishing Company. The Publishing Company has cross-appealed from a judgment entered against it in favor of Reid in the amount of $7,349, for damages for allegedly failing to employ him as a copyreader in one of its newspapers, because of his religion.

This is Reid's second appeal. Our opinion in the first appeal is reported at 468 F.2d 346 (6th Cir. 1972).

In his complaint Reid alleged that the defendant failed to employ him as a copyreader in one of its newpapers, Memphis Press Scimitar, because of his race (Negro) and his religion (Seventh Day Adventist) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* He prayed for a manda-

tory injunction ordering the defendant to employ him as a copyreader, awarding him back pay from the date of his application for employment (September 1967), and attorney's fees.

The District Court heard the evidence and on August 13, 1971 it adopted findings of fact and conclusions of law. The Court found that the defendant did not discriminate against the plaintiff in failing to employ him, either on account of his race or his religion.[1]

Relying on our decision in *Dewey v. Reynolds Metals Co.,* 429 F.2d 324 (6th Cir. 1970), *affirmed* by an equally divided court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971), the District Court held that the Press Scimitar was not required to accommodate Reid's religious practice of not working on Saturdays inasmuch as the position of copyreader, for which Reid had applied, required work on Saturdays. The Press Scimitar had never employed a copyreader who would not work on Saturdays. The District Court dismissed Reid's complaint.

On appeal (Reid's first appeal) the panel approved the findings of fact of the District Court and also its conclusions of law with respect to the racial issue, and that issue is no longer in the case.

The panel distinguished *Dewey* on the ground that it involved a major issue of arbitrability which is not present in the case at bar.[2]

*Dewey* was further distinguished on the ground that Regulation § 1605.1 of E.E.O.C. (39 C.F.R. 1605, adopted July 10, 1967) requiring accommodation, had not been adopted and was not in force at the time the controversy in *Dewey* arose, although the District Court in that case had erroneously applied it retroactively. This regulation was in full force and effect at the time Reid applied to defendant for employment.

---

1. The findings of fact and conclusions of law are set forth in our opinion in the first appeal and need not be repeated here.

2. The question of arbitrability was finally set to rest by the Supreme Court in *Alexander v.*

*Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). This question may have been the sole reason for the division of the Supreme Court in *Dewey.*

The employer in *Dewey* also permitted its employees to arrange for substitutes when they were required to work on Saturdays or Sundays, and we held that was an accommodation.

The panel remanded the case to the District Court to determine—

. . . whether the Press Scimitar could make "reasonable accommodation" to the religious practices of appellant Reid "without undue hardship." (468 F.2d 346)

It is interesting to note that in the "Conclusion" of his brief filed in the first appeal in this Court on March 8, 1972, Reid—

. . . respectfully prays this Court to reverse the decision of the district court and order the defendant appellee immediately to offer acceptable employment to the plaintiff.

Notwithstanding this prayer, it appears from the record in the present appeal that Reid nearly two years previously had accepted employment from another employer on July 1, 1970, at a salary higher than that offered by defendant. No mention was made of this fact in the findings of fact and conclusions of law adopted by the District Court at the first trial on August 13, 1971, nor in our opinion in the first appeal. 468 F.2d 346 (6th Cir. 1972). We would think that if this fact was in evidence the District Judge would have included it in his findings.

In his brief filed in the present appeal (second appeal) Reid offers the following explanation of his conduct, in footnote 1 on page 11:

Today plaintiff, because of the lengthy delays of litigation, has other employment. He sought this employment to survive and to mitigate damages. Like teachers discharged without due process, he is entitled to backpay. If he were still interested in this job, the defendant could, for the time, attempt an accommodation. The court below has denied attorneys fees because no injunction is now necessary. The net effect of that ruling is to penalize plaintiff and his counsel for attempting to mitigate damages.

No supporting record references are cited. This explanation simply does not make sense. Reid had already accepted other satisfactory employment at a higher salary, more than a year prior to the time the District Court adopted its findings of fact and conclusions of law at the first trial.

At the time Reid made application to defendant for the position of copyreader, Reid had employment as Editor of Tri-State Defender, at a salary of $100 per week. His beginning salary in defendant's employ would have been $125 per week plus stated annual increases if his work was satisfactory.

The claim that he accepted the new employment to mitigate damages is not understandable. He was not required to quit his employment at Tri-State Defender in order to secure a higher salary, for the benefit of the defendant, and he did not do so.

Furthermore, on the remand it does not appear that Reid offered to give the defendant the benefit of his higher salary to reduce his claim for damages, and the District Court in assessing damages allowed only the difference between the salary offered by defendant ($125 per week) and his salary at Tri-State Defender ($100 per week) in computing damages at $7,349, for the period from October, 1967 through June, 1970. Thus Reid's new position was not accepted by him in order to "survive and mitigate damages" as his brief alleges.

On the remand it was clear that the issue of mandatory injunction had long become moot, and the District Judge considered only the question of damages.

The District Court stated:

Since this suit was filed plaintiff has gained other satisfactory employment and does not at this time seek to become employed by the defendant. The relief now sought is monetary damages only. The amount of damages sought is the difference between what plaintiff would have earned while working as a copyreader for the defendant and the pay he received until he took a position paying more than he

would have earned as a copyreader for the defendant, and attorney's fees. (369 F.Supp. at 686)

■ The District Court was fully conversant with all of these facts when it denied attorney's fees to Reid. In our opinion it did not abuse its discretion in so doing, and its judgment, from which Reid appealed, is affirmed.

## I

The defendant owned and operated two large newspapers in Memphis, Tennessee, named The Commercial Appeal, which is a morning newspaper, and The Memphis Press-Scimitar, which is an afternoon newspaper, the Press-Scimitar publishing three editions daily (excluding Sundays) and two on Saturdays. The Commercial Appeal publishes every day, including Sunday.

Each newspaper maintains its own editorial department and they operate competitively, although they do not raid each other's personnel. The editorial departments include editors, copyreaders and reporters.

In September, 1967 Reid applied to the News Editor of the Press Scimitar for the position of copyreader. The Press Scimitar had ten copyreaders. One of its copyreaders, George Lapides, desired to be transferred to the Sports Department, and if the transfer were made there would be a vacancy. Lapides worked on Saturdays. Reid had been in the employ of the Tri-State Defender, a small weekly newspaper, located in Memphis.

The Press Scimitar's News Editor arranged for Reid to take a test, which he passed, and he was then sent to the Managing Editor, and by him to the Editor, for a final interview. Both News and Managing editors recommended his employment. At the final interview with the Editor, Reid's compensation of $125 per week was agreed upon, which was $25 per week more than he was receiving at Tri-State Defender.

During the course of his conversation with the Editor, Reid mentioned for the first time that he was a member of the Seventh Day Adventists, and that he could not accept employment requiring him to work on Saturdays. This fact had not been disclosed either to the News Editor or to the Managing Editor.

To employ Reid as a copyreader would have created serious and difficult problems for the newspaper, because Reid would never work on any Saturday and would be off work more than fifty Saturdays in a year. The Press Scimitar publishes two editions on Saturday; and even in an emergency when momentous news breaks, which has to be processed immediately because otherwise it becomes stale, the newspaper could never call upon Reid for any help on Saturdays.

The only position which the Press Scimitar had open was one which required work on Saturdays, and the man whom Reid was to replace if he was hired, worked on Saturdays.

The Commercial Appeal, on the other hand, publishes on Saturdays and Sundays. If it had an opening for a copyreader it could have accommodated Reid by having him exchange with a copyreader who wanted to work on Saturdays instead of Sundays. Commercial Appeal had employed Negroes as well as Seventh Day Adventists. Reid did not apply to the Commercial Appeal for any position, and there was no proof offered that it had an opening for a copyreader.

Copyreaders are specialists and are not readily interchangeable. The minimum number of copyreaders employed by the Press Scimitar from Monday through Friday, is seven; on Saturday the minimum is five.

Copyreaders serve as a "reduction group" to sift through, sort out, reduce, and locate in appropriate places in the newspaper all of the news which comes in by wire, from reporters and from other sources. The newspaper would not have space to publish all of the news which it receives, and not all news which

it receives is newsworthy. It takes real specialists to handle this work.

The Press Scimitar's copyreaders include a news editor, called a "slot man", a telegraph man, and a man to handle mid-south news; all of these positions require special skills and experience. The remaining copyreaders handle routine work of lesser importance, such as special features, make up, and markets.

The heaviest publication days are the first five days of the week, and the best qualified copyreaders are usually assigned to work on those days, leaving Saturdays as their day off. These are all men who would have seniority over Reid, if hired. It is necessary, occasionally, for copyreaders to work overtime during the first five days of the week.

The problems of work-scheduling copyreaders is set forth in the findings of fact adopted by the District Court, on the remand and the Court's findings are appended hereto as Appendix "A".

Even under ordinary circumstances, without anyone claiming special privileges, the work-scheduling of copyreaders presents a difficult task. This task is performed by the News Editor, with the approval of the Editor. In making the assignments he must take into account their special skills and adaptability for the work. The normal workday for copyreaders is eight hours; it ranges, however, from five o'clock a. m. until 4:30 p. m., except on Saturday when it extends only to 1:30 p. m. The News Editor must take into account absences of the copyreader on account of accident, illness, and vacation. Vacations run for two, three or four weeks, depending on length of service. Seniority must be taken into account also. Reid, as a new employee, would have no seniority.

In order for Reid to be accommodated, another copyreader who had seniority over Reid, would have to be involuntarily assigned to take his place on every Saturday, even though the other man did not desire to work on that day.

In Dewey, supra, there was no problem in providing substitutes for employees who did not want to work on Saturdays or Sundays, because that case involved a manufacturing plant with many employees who were doing the same type of work as Dewey. Some were pleased to have Dewey work in their place on Sundays, and they would substitute for him on Saturdays when requested; but Dewey finally took the position that it was a sin for him to ask anyone to substitute for him. The employer in Dewey required the employees to make their own arrangements, in order to avoid discrimination, and when Dewey declined and refused to work on Saturdays he was discharged.

Our case presents a problem entirely different than Dewey, because it involves only a limited number of specialists.

Copyreaders having seniority usually do not want to work on Saturday. They have already worked forty hours during the first five days of the week, and some may even have worked overtime. If they are required to work on Saturdays they would be entitled to overtime compensation. The Editor was of the opinion that even overtime was not a reasonable alternative. He was of the view that in order to accommodate Reid it would have been necessary for his newspaper to employ still another copyreader in addition to Reid.

In his findings of fact the District Judge found that the proof of expense which the newspaper would incur in order to accommodate Reid, was not specific. We disagree. The proof was specific that overtime would cost $77 per day. The extra copyreader would cost about $125 per week, which was the salary offered to Reid by Press Scimitar.

The Editor was of the opinion that to hire Reid, with all Saturdays off, would create a serious morale problem among the other nine copyreaders who would have seniority over Reid, but who, nevertheless, would be involuntarily assigned to take his place for Saturday work. The copyreader could believe that Reid was being given favorable treatment over them, because of his religion, and

that they were being discriminated against and were being penalized because they did not hold the same religious beliefs as Reid.

Furthermore, because Reid would never work on Saturdays, he could not be considered for promotion to better positions such as News Editor, Managing Editor, and Editor, all of whom work on Saturdays when necessary.

The District Court also made the following ultimate finding with respect to hardship:

> While it is true that the plaintiff's lack of experience on this newspaper's staff and the then existing problems of scheduling would cause additional burdens, which might be considered a hardship for management personnel, the test is *undue* hardship, which this Court does not believe to be established by the proof. (369 F.Supp. at 690).

Thus, the District Court was of the view that it is all right to impose a hardship on an employer, so long as it is not an *undue* hardship.

It is noteworthy that the District Court made no finding that the Press Scimitar discriminated against Reid on account of his religion. All that it found was that it would not have been an undue hardship for the Press Scimitar to accommodate Reid's religious practice.

Webster's New International Dictionary defines hardship as follows:

> 1. Hard circumstances of life; 2 a thing hard to bear; specific cause of discomfort or suffering as poverty, pain, etc. Syn. difficulty.

Undue is defined:

> 1. Not yet owing or payable as a debt; 2 improper; not appropriate or suitable; 3 not just, legal or equitable; 4 excessive, unreasonable, immoderate.

The District Court was of the view that Press Scimitar should have employed Reid on a trial basis in order to see how it would work out; but the District Court had already found that this would create a hardship. It would have imposed an additional hardship and expense on the newspaper "to try him out," when it knew it would not work.

Apparently no hardship was imposed on Reid because in July, 1970, long before the first trial, he accepted other employment at a higher salary, and which employment apparently did not require him to work on Saturday. He is no longer interested in working for Press Scimitar. All he wants now are damages, plus attorney's fees.

The undue hardship imposed on the Press Scimitar in the present case, as shown by the evidence and the findings of fact of the District Court include:

(1) Requiring it to employ Reid as a copyreader in a position which regularly required working on Saturdays, and to replace an employee who worked on Saturdays, when Reid declined to work on these days because of his religious beliefs and practice as a Seventh Day Adventist.

(2) To employ Reid would require the employer to assign, involuntarily, other copyreaders who would have seniority over Reid, to take his place, thereby incurring overtime expense amounting to $77 per day. The Editor testified that even overtime was not a reasonable alternative, and that it would probably be necessary to employ an additional copyreader. Thus, to employ Reid would require the employer to employ two copyreaders, when it needed only one.

(3) The involuntary assignment of other copyreaders to work on Saturday to substitute for Reid, when they had seniority over Reid, who had no seniority, would create serious morale problems among the other copyreaders.

■ In our opinion the ultimate finding of the District Court that the accommodation of Reid's religious practice of not working on Saturdays would not have imposed an undue hardship on his employer, is not supported by substantial evidence and is clearly erroneous.

## II

Title VII of the Civil Rights Act of 1964 contains two sections which are relevant to the controversy here.

42 U.S.C. § 2000e–2(a) provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise *discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . (Emphasis added).

42 U.S.C. § 2000e–5(g) provides in relevant part:

. . . No order of the Court shall require . . . the hiring reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual . . . was refused employment or advancement or was suspended or discharged for any reason other than *discrimination* on account of race, color, religion, sex, or national origin . . . (Emphasis added).

These two statutes are plain and unambiguous. They are aimed solely at discrimination and nothing else.

The legislative history of the 1964 Act indicates that Congress was concerned that management prerogatives should be left undisturbed to the greatest extent possible, and that internal affairs of employers must not be interfered with except to the limited extent that correction is required in *discriminatory* practices. 1964 U.S.Cong. & Admin.News, at p. 2516.

EEOC recognized the congressional mandate in its initial 1966 Guidelines. These Guidelines provided:

Section 1605.1(a):

"(3) However, the Commission believes that an employer is free under Title VII to establish a normal work week (including paid holidays) generally applicable to all employees, notwithstanding that this schedule may not operate with uniformity in its effect upon the religious observances of his employees. For example, an employer who is closed for business on Sunday does not discriminate merely because he requires that all his employees be available for work on Saturday."

Section 1605.1(b):

"(3) The employer may prescribe the normal work week and foreseeable overtime requirements, and, absent an intent on the part of the employer to discriminate on religious grounds, a job applicant or employee who accepted the job knowing or having reason to believe that such requirements would conflict with his religious obligations is not entitled to demand any alterations in such requirements to accommodate his religious needs."

These two guidelines carried into effect the will of Congress as expressed in 42 U.S.C. §§ 2000e–2(a) and 2000e–5(g). They expressly recognized that the employer was free under Title VII to establish a normal work week (including paid holidays) generally applicable to all employees, even though it may not operate with uniformity in its effect upon the religious observances of his employees. The job applicant, knowing or having reason to believe that such requirements would conflict with his religious obligations, was not entitled to demand any alterations in the requirements to accommodate his religious needs. Under this regulation Reid would not have been entitled to demand any accommodation from Press Scimitar to accommodate his religious practices.

It was not until 1967 that EEOC abandoned the 1966 Guidelines and adopted a new Guideline, which provides as follows:

PART 1605—GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION

§ 1605.1 Observation of the Sabbath and other religious holidays.

(a) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or refuse to hire employes who regularly observe Friday evening and Saturday, or some

other day of the week, as the Sabbath or who observe certain special religious holidays during the year and, as a consequence, do not work on such days.

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

(d) The Commission will review each case on an individual basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people.
(Sec. 713(b), 78 Stat. 265; 42 U.S.C. 2000–12 [§ 2000e–12(b)]) [32 F.R. 10298, July 13, 1967]

This guideline for the first time decreed that the duty not to discriminate on religious grounds included an additional obligation on the part of the employer to accommodate all of the religious practices of his employees or prospective employees so long as they did not impose an undue hardship on him.

■ We submit that a fair reading of the two statutes hereinbefore quoted discloses no such legislative intent, nor is the guideline supported by the legislative history which we have detailed in *Dewey.* The clear language of the statutes does not indicate that Congress ever intended to coerce employers into accommodating all of the religious practices of their employees or prospective employees.

Title VII, in proscribing discriminatory practices in employment, served a legitimate and laudable legislative purpose; the 1967 EEOC Guideline 1605.1 does not. By this Guideline EEOC has injected something new and entirely different from discrimination. It has required employers not only to tolerate the religious beliefs but also all of the religious practices of their employees, no matter what they are, even though a hardship is inflicted on the employer, so long as it is not an undue hardship. The legislative history of the Act does not show anything that employers have done to warrant such treatment.

In *Dewey, supra,* the District Court applied the 1967 Guideline notwithstanding the fact that it was not in force at the time the claim in that case accrued. The 1966 regulation was actually in force when the controversy in *Dewey* arose. We expressed doubts in footnote 1, in *Dewey,* as to the authority of EEOC to adopt the 1967 Guideline which was erroneously applied by the District Judge. We stated:

It should be observed that it is regulation 1605.1(b) and not the statute (§ 2000e–2(a)) that requires an employer to make reasonable accommodation to the religious needs of its employees. As we have pointed out, the gravamen of an offense under the statute is *only* discrimination. The authority of EEOC to adopt a regulation interfering with the internal affairs of an employer, absent discrimination, may well be doubted. (429 F.2d at 331, n.1)

This doubt was based on the fact that the two statutes hereinbefore quoted were aimed solely at discrimination. Actually the statutes needed no Guideline or Regulation to interpret them.

While Congress has authority to grant power to an administrative agency to prescribe rules and regulations to administer a statute in order to carry into effect the will of Congress as expressed in the statute, that authority does not include the power to make law, because no such power can be delegated by Congress. The two statutes expressed nothing about a requirement for employers to accommodate the religious practices of its employees.

In *Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936), the Supreme Court held:

The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end *is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. Lynch v. Tilden Produce Co.,* 265 U.S. 315, 320–322 [44 S.Ct. 488, 68 L.Ed. 1034]; *Miller v. United States,* 294 U.S. 435, 439, 440 [55 S.Ct. 440, 79 L.Ed. 977], and cases cited. And not only must a regulation, in order to be valid, be consistent with the statute, but it must be reasonable.

*International R. Co. v. Davidson,* 257 U.S. 506, 514 [42 S.Ct. 179, 66 L.Ed. 341]. The original regulation as applied to a situation like that under review is both inconsistent with the statute and unreasonable. (Italics added) (*Id.* at 134–135, 56 S.Ct. at 400).

See also *M. E. Blatt Co. v. United States,* 305 U.S. 267, 59 S.Ct. 186, 83 L.Ed. 167 (1938); *Koshland v. Helvering,* 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268 (1936); *Commissioner v. General Mach. Corp.,* 95 F.2d 759 (6th Cir. 1938).

On March 24, 1972, nearly five years after the rights of the parties in the present case had accrued, Congress amended the Act to define religion. 42 U.S.C. § 2000e(j). This definition reads as follows:

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

The subsequent enactment of § 2000e(j) in 1972 cannot be relied on to establish a Congressional intent with respect to the 1964 statute, which was not expressed in that statute.

As well stated by the Supreme Court in *Helvering v. Credit Alliance Corp.,* 316 U.S. 107, 112, 62 S.Ct. 989, 992, 86 L.Ed. 1307 (1942):

Section 115(h) was amended in 1938, * * * subsequent to the consummation of the transaction here in question, to include money or property, but we cannot, as the Government suggests, read into the section, as it stood when the transaction took place, an intent derived from the policy disclosed by the subsequent amendment.

In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), Chief Justice Burger, who wrote the opinion for the Court, stated:

Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification. (*Id.* at 430–431, 91 S.Ct. at 853).

*Griggs* involved § 703(h) of the Act relating to tests and EEOC Guideline issued on August 24, 1966 interpreting that section to permit only the use of job related tests. The Supreme Court held that this regulation was a correct interpretation of the intent of Congress.

We do not read *Griggs* as requiring the appellant, in order to accommodate Reid, to suffer a hardship, to hire two copyreaders when it needs only one, to require it to incur overtime expense of $77 per day, or to require it to involuntarily assign other copyreaders who would have seniority over Reid, to substitute for him on Saturdays, thereby creating havoc and serious morale problems among its employees.

The judgment of the District Court in Appeal No. 74–1761, which denied attorneys' fees, is affirmed.

The judgment of the District Court in Appeal No. 74–1762, which awarded damages against the defendant, is reversed, and the case is remanded for dismissal of the complaint.

### APPENDIX "A"

The proof establishes that a newspaper copy desk is a kind of reduction or selection department for news. Much more news comes to the paper through the wire services and through local sources than can be printed in the paper. The news that comes in includes world news, national news and local news. It is the duty of the News Editor to receive and review the news; edit it; determine what will be printed; check for punctuation; check for accuracy of fact; write head lines and sub-heads; make selection of news items or stories based upon various factors such as the nature of the news, the edition concerned, length of the story or item, and the like. The copyreaders assist the News Editor in this task.

Copyreaders sit at a horseshoe shaped desk. The News Editor, or person performing his function, sits at the middle of the desk and is called the slot man. The copyreaders sit around the rim of the deck. As news comes in to the slot man he passes it to one of the copyreaders for appropriate action.

Copyreaders usually develop special abilities in addition to their general abilities and normal operations require a crew of copyreaders who possess expertise or experience in specific areas. Some of those specific areas or specialties at the Press-Scimitar are: the ability to perform as slot man; to handle telegraph, i. e. news arriving by wire; to handle Mid-South news; to handle society copy; to handle the magazine section, special features, makeup and markets.

The Press-Scimitar's normal complement of copyreaders is ten, including the News Editor who mans the slot position when on duty.

The scheduling of the copyreaders is done on a weekly basis by the News Editor subject to the approval of the Managing Editor. The scheduling is difficult for various reasons. First, the specialty requirement must be considered. While some copyreaders possess more than one speciality, in addition to their general ability, none possess all of the specialties; and while some by additional training might acquire additional special skills, experience has demonstrated that certain ones are more adapted by nature, and others less adapted by nature, to become proficient in special skills. Because of this need for special sk'lls, all copyreaders are not interchangeable with all other copyreaders.

The processing of the three editions published daily by the Press-Scimitar, Monday through Friday, requires copyreaders' services during a period of time which may vary somewhat on different days but ranges from 5 o'clock A.M. to as late as 4:30 P.M. This range of time usually requires two different persons to man the slot position on days other than Saturday. The Saturday period ranges from 5:00 A.M. to about 1:30 P.M.

The length of a normal work day for a copyreader is eight hours. The copy desk work must be so scheduled as to have adequate manpower with proper

APPENDIX "A"—Continued

specialties present during the entire copy desk operation period. Each copyreader gets an annual vacation of two, three or four weeks, depending upon his length of service. Timewise, about forty-six weeks of time go into vacations and holidays for the copyreaders. Sickness takes about another eight weeks. With a normal complement of ten copyreaders, including the News Editor, overtime work is required of copyreaders from time to time in order to meet the manpower requirements on the copy desk.

Trial Exhibits 4 and 5 of the June 1973 hearing are copies of weekly schedules for the copyreaders. Trial Exhibit 4 is a May 1973 schedule and Trial Exhibit 5 is a collective exhibit of five weekly schedules in November and December 1967. These exhibits and testimony of the News Editor, Luther Southworth, show some of the problems of scheduling. However, they also reflect that there are regular variations from the desired normal situation and so called minimum standards. They also show that some copyreaders are pulled off the copy desk for other editorial assignments, and on some occasions reporters are used as copyreaders.

\* \* \* \* \* \*

The proof shows that the News Editor intended to observe plaintiff's performance during a period of his adjustment to the job of copyreader at this particular paper in the light of all the duties to be performed by the available personnel. This is a process which would apply on the hiring of any new copyreader. Because the plaintiff was not hired, there is no way to determine how long it would have taken to discover what jobs the plaintiff was best suited for. However, the record clearly establishes that the plaintiff had sufficient skill and experience to successfully become one of the ten copyreaders on the Press-Scimitar staff.

Proof was offered by the defendant that an alternative to manpower short-age would be to require overtime work from the available staff, at time and one-half pay, or to employ an extra copyreader. However, the proof in this regard was not specific and the amount of the additional economic burden incident to such overtime or employment of extra personnel was not shown.

The defendant contends and offered opinion testimony from the executive personnel that if plaintiff had been employed by the defendant with all Saturdays guaranteed off, a serious morale problem would have been encountered. The proof shows two copyreader employees, Pinegar and Parker, who customarily work on Saturday, had requested to be scheduled so as to have Saturday off, but these were not for religious reasons. Their requests were refused. The proof shows that all copyreaders, with the exception of the News Editor himself, are required to work from time to time on Saturday, in order to meet the manpower requirements which sometimes become critical due to factors of vacation, sickness and the fact that all copyreaders are not interchangeable. However, the proof also shows that Saturday work is infrequent for some copyreaders and there is a not too clearly defined rank hierarchy based upon the length of service and other factors. Presumably, the lower morale would result from resentment of the copyreaders with more seniority who preferred to be off on Saturday for non-religious reasons, if the management sought to accommodate the plaintiff's religious practices. There is also opinion testimony offered by the plaintiff from a former employee of the Press-Scimitar editorial department to the effect that plaintiff would overcome this resentment.

EDWARDS, Circuit Judge (dissenting).

In *Reid v. Memphis Publishing Co. (I)*, 468 F.2d 346 (6th Cir. 1972), this court upheld the applicability and constitutionality of an Equal Employment Opportunity Commission regulation, 29 C.F.R. § 1605.1 (1974), and remanded the case

to the District Court for hearing and determinations of fact concerning "undue hardship."

No judge of the court filed any motion for reconsideration in banc.

On remand the District Judge reheard the case, made extensive findings of fact and entered judgment for the plaintiff. He held that defendant had made *no effort whatsoever to accommodate plaintiff Reid's religious beliefs.* His critical findings of fact were as follows:

> Furthermore, it should be noted that one of the distinctions made by the Court of Appeals between the *Dewey* case and the instant case was that the employer had offered an accommodation to Dewey prior to his being discharged. *Reid v. Memphis Publishing Co., supra,* at page 349. In the instant case the defendant is unwilling to offer to anyone an accommodation in the form of being allowed to be off work on any day for religious purposes.

> Having determined that a request for Saturday off for religious reasons is a reasonable accommodation, it is incumbent upon this Court to apply the facts of the case to the "undue hardship" test referred to in the E.E. O.C. regulation and the Court of Appeals remand.

> The regulation specifies an example of § 1605.1(b) wherein it provides:

> > "Such undue hardship for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer."

> This would indicate that an employer would be expected to assign other employees voluntarily or involuntarily to perform the work of the Sabbath observer, provided the accommodation meets the test of reasonableness and does not create an undue hardship otherwise.

> In the instant case clearly there were other copy readers of substantially similar qualifications to perform the work to be done by the plaintiff during his observance of the Sabbath. Upon consideration of the proof pertaining to specific hardships, such as the scheduling of copy readers of particular experience, the possible effect of morale of other employees, and the possible economic burden caused by additional overtime, the Court concludes that the defendant has not proven that an undue hardship would have rendered the required accommodation to the religious needs of the plaintiff unreasonable, particularly, in view of the fact that the defendant personnel did not make any attempt to accommodate the religious needs of the plaintiff.

> While it is true that the plaintiff's lack of experience on this newspaper's staff and the then existing problems of scheduling would cause additional burdens, which might be considered a hardship for management personnel, the test is *undue* hardship, which this Court does not believe to be established by the proof.

The District Judge awarded plaintiff damages of $7,349—the carefully computed difference between the salary Reid would have earned with defendant and what he actually did earn in the years before he secured a better paying job. He denied plaintiff's request for attorney fees.

Astonishingly, my colleagues now reverse the District Court's carefully considered judgment simply by accepting the defendant's contentions as to the facts. As I view the matter, the majority opinion retries this case on the written record, giving no weight to the great advantage the trial judge has in seeing, hearing and judging the credibility of the witnesses.

Additionally, the majority opinion has the effect of reversing the burden of proof which the regulation places upon

the employer to establish undue hardship.[1]

A full description of the case follows, including the bulk of the District Judge's opinion and findings of fact.

This case represents the second appeal in a continuing controversy between appellant Reid, a black member of the Seventh Day Adventist Church, and the company which publishes both the Memphis Press-Scimitar and the Commercial Appeal. In the first appeal, *Reid v. Memphis Publishing Co.*, 468 F.2d 346 (6th Cir. 1972), we held, contrary to the view of the District Judge, that an Equal Employment Opportunity Commission regulation, 29 C.F.R. § 1605.1 (1974),[2] was applicable at the time Reid was denied employment when he refused to work on Saturday due to his religious beliefs. The regulation in question requires employers to make "reasonable accommodations" to the religious needs of employees where such can be accomplished "without undue hardship."

By holding this regulation to be applicable, we distinguished this case from *Dewey v. Reynolds Metals Co.*, 429 F.2d 324 (6th Cir. 1970), *aff'd by an equally divided court*, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971), where this court's majority opinion had held that this same regulation was not applicable at the time of the discharge there complained of and that it was not retroactive in effect.

Subsequent to defendant's refusal to hire Reid in this case, but prior to our original case, the United States Congress amended Title VII so as to add to 42 U.S.C. § 2000e (1970), the following language:

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an

---

1. For quite different reasons, both of my respected colleagues have deep-seated beliefs that the regulation at issue, 29 C.F.R. § 1605.1 (1974) (now enacted in the same words in statutory form, 42 U.S.C. § 2000e(j) (Supp. III, 1973)) is unconstitutional.

Judge Weick has expressed his concern that the regulation violates employer's constitutional rights in *Dewey v. Reynolds Metals Co.*, 429 F.2d 324, 331 n. 1, 334–35 (6th Cir. 1970), *aff'd by an equally divided court*, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). Judge Celebrezze has written strongly in dissent in *Cummins v. Parker Seal Co.*, 516 F.2d 544 at 554–560 (6th Cir. 1975) (A. Celebrezze, J., dissenting), that the regulation (1605.1) is a violation of the establishment of religion clause of the First Amendment to the United States Constitution.

Neither of these constitutional arguments is frivolous and neither has been precisely dealt with by the United States Supreme Court. Each has, however, been rejected by a panel opinion of this court. *See Reid v. Memphis Publishing Co., supra; Cummins v. Parker Seal Co., supra.* In neither instance has there been a *motion for* rehearing in banc by any judge of this court.

2. **§ 1605.1 Observation of the Sabbath and other religious holidays.**

(a) Several complaints filed with the Commission have raised the question *whether it is* discrimination on account of religion to discharge or refuse to hire employees who regularly observe Friday evening and Saturday, or some other day of the week, as the Sabbath or who observe certain special religious holidays during the year and, as a consequence, do not work on such days.

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable.

(d) The Commission will review each case on an individual basis in an effort to seek an equitable application of these guidelines to the variety of situations which arise due to the varied religious practices of the American people.

employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

Act of Mar. 24, 1972, Pub.L. No. 92–261, § 2, 86 Stat. 103, amending 42 U.S.C. § 2000e (1970) (codified at 42 U.S.C. § 2000e(j) (Supp. III, 1973)).

We noted in our prior opinion:

As shown in *Riley v. Bendix Corp.*, 464 F.2d 1113 (5th Cir. 1972) 4 E.P.D. § 7902, legislative history of this amendment stresses that the regulation (29 C.F.R. § 1605.1) did express the prior intention of Congress. This subsequent congressional affirmation strengthens our conclusion about the validity of the regulation.

*Reid v. Memphis Publishing Co.*, 468 F.2d 346, 351 (6th Cir. 1972).

On remand additional proofs were taken. Judge McRae there held on the crucial issue not only that the facts in the record did not disclose any "*undue* hardship" to the potential employer, but that defendant had made no effort whatever to accommodate Reid's religious beliefs. The District Judge reiterated a prior finding (made in the original case) that there was no intentional discrimination on the part of the defendant, but as indicated above, he awarded Reid $7,349 in damages.

Plaintiff's appeal pertains solely to the disallowance of the attorney fees, while defendant contends that under the facts of its particular business, no accommodation to Reid's religious objection to Saturday work was possible and, hence, that its failure to make any attempt to accommodate was irrelevant.

As to this last issue, Judge McRae's critical findings were:

Since this suit was filed plaintiff has gained other satisfactory employment and does not at this time seek to became employed by the defendant. The relief now sought is monetary damages only. The amount of damages sought is the difference between what plaintiff would have earned while working as a copyreader for the defendant and the pay he received until he took a position paying more than he would have earned as a copyreader for the defendant, and attorney's fees.

For clarity, the Court reiterates certain findings, namely, that the plaintiff was well qualified to become a copyreader for the defendant; that plaintiff was a member of the Seventh-Day Adventist Church; that one of the religious principles of the Seventh-Day Adventist Church is that its members should not work on Saturday; that plaintiff was offered the job as a copyreader on the Press-Scimitar on the condition that he make himself available to work on any day, including Saturday.

The record further establishes that the Memphis Press-Scimitar, the one of the defendant's two newspapers on which there was an opening for a copyreader, publishes three editions Monday through Friday, two editions on Saturday and no editions on Sunday, and that the plaintiff declined to accept the position due to his sincere religious belief that he should not work on Saturday.

In accordance with the direction of the Court of Appeals Opinion, further evidence was offered on the employment practices of the Memphis Commercial Appeal, the other newspaper published by the defendant publishing company.

The proof shows that the Commercial Appeal had at the time in question two employees who were of the Seventh-Day Adventist faith and who were not required to work on Saturday. These employees were Lindley Richert and Glenn Allen. Richert was employed by the Commercial Appeal as a copyreader. The editor of the Commercial Appeal who employed Richert knew that Richert was a Seventh-Day Adventist and that he would not work on Saturday. However, since the Commercial Appeal publishes seven days per week, it has need of copyreaders seven days a week. Sunday was a less preferable work day for many of the copyreaders; therefore, the editor employed Richert and assigned him to Sunday work on a regular basis

with Saturday as one of his regular days off.

In the case of Allen, he had been an employee of the Commercial Appeal before he became a Seventh-Day Adventist. He worked in the Commercial Appeal's library, which is staffed seven days a week. Allen customarily worked on Sunday and continued to work on Sunday after he became a Seventh-Day Adventist.

No charges in work schedules were required to be made by the Commercial Appeal, in order to accommodate Saturdays off for either Richert or Allen. On the contrary, their ready willingness to work on Sundays was well-suited to the Commercial Appeal's seven-days-per-week publishing requirement and was actually an accommodation to the newspaper.

At the supplemental evidentiary hearing the defendant offered further testimony pertaining to the duties of copyreaders at the Memphis Press-Scimitar in an effort to meet the burden of proof cast upon it by the E.E.O.C. regulation determined to be applicable by the Court of Appeals, namely, that the accommodation of granting the plaintiff Saturday off would create an undue hardship on the newspaper.

The proof establishes that a newspaper copy desk is a kind of reduction or selection department for news. Much more news comes to the paper through the wire services and through local sources than can be printed in the paper. The news that comes in includes world news, national news and local news. It is the duty of the News Editor to receive and review the news; edit it; determine what will be printed; check for punctuation; check for accuracy of fact; write head lines and sub-heads; make selection of news items or stories based upon various factors such as the nature of the news, the edition concerned, length of the story or item, and the like. The copyreaders assist the News Editor in this task.

Copyreaders sit at a horseshoe shaped desk. The News Editor, or person performing his function, sits at the middle of the desk and is called the slot man. The copyreaders sit around the rim of the desk. As news comes in to the slot man he passes it to one of the copyreaders for appropriate action.

Copyreaders usually develop special abilities in addition to their general abilities, and normal operations require a crew of copyreaders who possess expertise or experience in specific areas. Some of those specific areas or specialties at the Press-Scimitar are: the ability to perform as slot man; to handle telegraph, i. e. news arriving by wire; to handle Mid-South news; to handle society copy; to handle the magazine section; special features, makeup and markets.

The Press-Scimitar's normal complement of copyreaders is ten, including the News Editor who mans the slot position when on duty.

The scheduling of the copyreaders is done on a weekly basis by the News Editor subject to the approval of the Managing Editor. This scheduling is difficult for various reasons. First, the specialty requirement must be considered. While some copyreaders possess more than one specialty, in addition to their general ability, none possess all of the specialties; and while some by additional training might acquire additional special skills, experience has demonstrated that certain ones are more adapted by nature, and other less adapted by nature, to become proficient in special skills. Because of this need for special skills, all copyreaders are not interchangeable with all other copyreaders.

The processing of the three editions published daily by the Press-Scimitar, Monday through Friday, requires copyreader services during a period of time which may vary somewhat on different days but ranges from 5 o'clock A.M. to as late as 4:30 P.M. This range of time usually requires two different persons to man the slot position on days other than Saturday. The Saturday period ranges from 5:00 A.M. to about 1:30 P.M.

The length of a normal work day for a copyreader is eight hours. The copy

desk work must be so scheduled as to have adequate manpower with proper specialties present during the entire copy desk operation period. Each copyreader gets an annual vacation of two, three or four weeks, depending upon his length of service. Timewise, about forty-six weeks of time go into vacations and holidays for the copyreaders. Sickness takes about another eight weeks. With a normal complement of ten copyreaders, including the News Editor, overtime work is required of copyreaders from time to time in order to meet the manpower requirements on the copy desk.

Trial Exhibits 4 and 5 of the June 1973 hearing are copies of weekly schedules for the copyreaders. Trial Exhibit 4 is a May, 1973 schedule and Trial Exhibit 5 is a collective exhibit of five weekly schedules in November and December, 1967. These exhibits and testimony of the News Editor, Luther Southworth, show some of the problems of scheduling. However, they also reflect that there are regular variations from the desired normal situation and so called minimum standards. They also show that some copyreaders are pulled off the copy desk for other editorial assignments, and on some occasions reporters are used as copyreaders.

At the time plaintiff was being considered for the copyreader position, the Editor of the Press-Scimitar was planning to transfer George Lapides, one of the copyreaders, to another position, and he planned to put plaintiff, if employed, into the position to be vacated by Lapides. It was customary for Lapides to work on Saturday.

The proof shows that the News Editor intended to observe plaintiff's performance during a period of his adjustment to the job of copyreader at this particular paper in the light of all the duties to be performed by the available personnel. This is a process which would apply on the hiring of any new copyreader. Because the plaintiff was not hired, there is no way to determine how long it would have taken to discover what jobs the plaintiff was best suited for. However, the record clearly establishes that the plaintiff had sufficient skill and experience to successfully become one of the ten copyreaders on the Press-Scimitar staff.

Proof was offered by the defendant that an alternative to manpower shortage would be to require overtime work from the available staff, at time and one-half pay, or to employ an extra copyreader. However, the proof in this regard was not specific and the amount of the additional economic burden incident to such overtime or employment of extra personnel was not shown.

The defendant contends and offered opinion testimony from the executive personnel that if plaintiff had been employed by the defendant with all Saturdays guaranteed off, a serious morale problem would have been encountered. The proof shows two copyreader employees, Pinegar and Parker, who customarily work on Saturday, had requested to be scheduled so as to have Saturday off, but these were not for religious reasons. Their requests were refused. The proof shows that all copyreaders, with the exception of the News Editor himself, are required to work from time to time on Saturday, in order to meet the manpower requirements which sometimes become critical due to factors of vacation, sickness and the fact that all copyreaders are not interchangeable. However, the proof also shows that Saturday work is infrequent for some copyreaders and there is a not too clearly defined rank hierarchy based upon the length of service and other factors. Presumably, the lower morale would result from resentment of the copyreaders with more seniority who preferred to be off on Saturday for non-religious reasons, if the management sought to accommodate the plaintiff's religious practices. There is also opinion testimony offered by the plaintiff from a former employee of the Press-Scimitar editorial department to the effect that plaintiff would overcome this resentment.

The above noted proof addresses itself primarily to the "undue hardship" test which was offered alternatively in the event that the Court does not adopt a finding which supports the defendant's persistent position, namely, that granting a member of the editorial department of the Memphis Press-Scimitar a regular day off for religious purposes is contrary to the policy of the newspaper which is applied equally to all personnel.[1]

[1] While there is no proof that any person who observes the Sabbath on Sunday has indicated unwillingness to do so on religious grounds, the customs and practices of the community and the newspaper permit the employees of the Memphis Press-Scimitar to be off on Sunday except in unusual circumstances.

By taking this position the defendant effectively contends that the plaintiff's request to be relieved from Saturday work would be beyond the scope of a "reasonable accommodation" of his religious practices. This Court concludes that the request of the plaintiff to be relieved of Saturday work upon the basis of religious beliefs is within the scope of the "reasonable accommodation" test imposed by Congress and those authorized to promulgate E.E.O.C. regulation 1605.

Furthermore, it should be noted that one of the distinctions made by the Court of Appeals between the *Dewey* case and the instant case was that the employer had offered an accommodation to Dewey prior to his being discharged. *Reid v. Memphis Publishing Co., supra,* at page 349. In the instant case the defendant is unwilling to offer to anyone an accommodation in the form of being allowed to be off work on any day for religious purposes.

Having determined that a request for Saturday off for religious reasons is a reasonable accommodation, it is incumbent upon this Court to apply the facts of the case to the "undue hardship" test referred to in the E.E.O.C. regulation and the Court of Appeals remand.

The regulation specifies an example in § 1605.1(b) wherein it provides:

"Such undue hardship for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer."

This would indicate that an employer would be expected to assign other employees voluntarily or involuntarily to perform the work of the Sabbath observer, provided the accommodation meets the test of reasonableness and does not create an undue hardship otherwise.

In the instant case clearly there were other copyreaders of substantially similar qualifications to perform the work to be done by the plaintiff during his observance of the Sabbath. Upon consideration of the proof pertaining to specific hardships, such as the scheduling of copyreaders of particular experience, the possible effect of morale of other employees, and the possible economic burden caused by additional overtime, the Court concludes that the defendant has not proven that an undue hardship would have rendered the required accommodation to the religious needs of the plaintiff unreasonable, particularly, in view of the fact that the defendant personnel did not make any attempt to accommodate the religious needs of the plaintiff.

While it is true that the plaintiff's lack of experience on this newspaper's staff and the then existing problems of scheduling would cause additional burdens, which might be considered a hardship for management personnel, the test is *undue* hardship, which this Court does not believe to be established by the proof.

This Court has previously found that there was no intentional discrimination on the part of defendant personnel due to plaintiff's religion. Similarly, there is no proof that the executives of the defendant were aware of the obligations imposed upon them by the regulation at the time of the refusal to hire. However, the opinion of the Court of Appeals in this case applied *Griggs v. Duke Pow-*

*er Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and quoted therefrom with regard to the principle that the Civil Rights Act of 1964 proscribes not only overt discrimination, but also practices that are fair in form, but discriminatory in operation. 468 F.2d at page 350. ". . . Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." *Griggs v. Duke Power Co., supra* [401 U.S.] at page 432, 91 S.Ct. at page 854.

It must be remembered that Congress by the Civil Rights Act of 1964 recognized and established new statutory rights of employees in the areas of race, religion and sex. This imposed obligations on employers and, to some extent, employees to change some long standing policies and practices.

These findings of fact we review, of course, under the "clearly erroneous" standard. Fed.R.Civ.P. 52(a). Here the record shows that Saturday was the lightest work day of the six regularly scheduled work days. It does not show that accommodating Reid's religious beliefs would have occasioned any added expense of any kind to defendant, unless we assume that other employees would have refused Saturday assignments because Reid was exempted from them. There is no evidence which supports such an assumption because, as the District Judge pointed out, defendant did nothing whatever to explore what it could do to accommodate Reid's religious beliefs. At a minimum, I believe the regulation here involved (now adopted by law) requires more than a simple assertion by an employer that it had always required Saturday availability and would not hire an employee who was not prepared to work on that day.

Furthermore, although the District Judge made no reference to it and placed no reliance upon it, this same employer through its other wholly-owned paper, the Memphis Commercial Appeal, operated a seven-day a week newspaper where Reid's ready availability for *Sunday* work would have been a distinct asset. Yet the record discloses no consideration at all by the employer of any possible exchange of personnel.

There may, of course, be situations where a prospective employee's unavailability for Saturday work would make his employment truly an undue hardship. A small newspaper which needed only one sports reporter could hardly hire a Seventh-Day Adventist for that spot without "undue hardship." This case, however, presents no such facts. The District Judge's findings of fact are accurate and complete. They certainly are not "clearly erroneous." The judgment of the District Court as to damages should be affirmed.

As to plaintiff's appeal from denial of attorney fees, the case should be remanded for further consideration. This is a Title VII action where Congress has squarely authorized attorney fees. 42 U.S.C. § 2000e–5(k) (1970); *See Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).